CASE NO. 24-3054

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

ESTATE OF JAY ANDERSON, JR, et al.,

        Plaintiffs-Appellants,

v.

JOSEPH MENSAH, et al.,

        Defendants-Appellees

Case No. 21-CV-1179
(Consolidated with 21-CV-848)

---

On Appeal from the United States District Court
For The Eastern District of Wisconsin
Case No: 21-CV-1179
The Honorable Lynn Adelman

---

## BRIEF AND REQUIRED SHORT APPENDIX OF
## APPELLANT ESTATE OF JAY ANDERSON, JR.

---

**CADE LAW GROUP LLC**
Nathaniel Cade, Jr.*
Annalisa Pusick
P.O. Box 170887
Milwaukee, WI 53217
Phone: (414) 255-3802
Fax: (414) 255-3804
nate@cade-law.com
annalisa@cade-law.com

**MOTLEY LEGAL SERVICES**
Kimberley Cy. Motley
P.O. Box 1433
Matthews, NC 28270
Phone: (704) 763-5413
Fax: (704) 909-4100
kmotley@motleylegal.com
Attorneys for Appellant

*Lead Counsel of Record*

## <u>CIRCUIT RULE 26.1 DISCLOSURE STATEMENT</u>

The undersigned counsel for Plaintiff-Appellant furnishes the following list in compliance with Circuit Rule 26.1:

1. The full name of every party that attorney represents in this case:

   Estate of Jay Anderson, Jr., by and through Special Administrator, Starkeisha DeLaRosa and J.A., through her next friend Starkeisha DeLaRosa.

2. The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

   Cade Law Group LLC
   Motley Legal Services

3. Any parent corporation and any publicly held company that own 10% or more of stocks of shares:

   None.

Dated this 7th day of January, 2025.

CADE LAW GROUP LLC

By: *Electronically Signed: Annalisa Pusick*
    Nathaniel Cade, Jr., SBN 1028115
    Annalisa Pusick SBN 1116379
    Madison Bedder SBN 1121996
    P.O. Box 170887
    Milwaukee, WI  53217
    (414) 255-3802 (phone)
    (414) 255-3804 (fax)
    nate@cade-law.com
    annalisa@cade-law.com
    madison@cade-law.com

MOTLEY LEGAL SERVICES

    Kimberley Cy. Motley SBN 1047193
    P.O. Box 1433
    Matthews, NC 28106
    (704) 763-5413 (phone)
    (704) 909-4100 (fax)
    kmotley@motleylegal.com

ii

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Plaintiff-Appellant furnishes the following list in compliance with Circuit Rule 26.1:

4. The full name of every party that attorney represents in this case:

> Estate of Jay Anderson, Jr., by and through Special Administrator, Starkeisha DeLaRosa and J.A., through her next friend Starkeisha DeLaRosa.

5. The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

> Cade Law Group LLC
> Motley Legal Services

6. Any parent corporation and any publicly held company that own 10% or more of stocks of shares:

> None.

Dated this 7th day of January, 2025.

CADE LAW GROUP LLC

By: *Electronically Signed: Nathaniel Cade*
  Nathaniel Cade, Jr., SBN 1028115
  Annalisa Pusick SBN 1116379
  Madison Bedder SBN 1121996
  P.O. Box 170887
  Milwaukee, WI  53217
  (414) 255-3802 (phone)
  (414) 255-3804 (fax)
  nate@cade-law.com
  annalisa@cade-law.com
  madison@cade-law.com

MOTLEY LEGAL SERVICES

  Kimberley Cy. Motley SBN 1047193
  P.O. Box 1433
  Matthews, NC 28106
  (704) 763-5413 (phone)
  (704) 909-4100 (fax)
  kmotley@motleylegal.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Plaintiff-Appellant furnishes the following list in compliance with Circuit Rule 26.1:

7.  The full name of every party that attorney represents in this case:

> Estate of Jay Anderson, Jr., by and through Special Administrator, Starkeisha DeLaRosa and J.A., through her next friend Starkeisha DeLaRosa.

8.  The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

> Cade Law Group LLC
> Motley Legal Services

9.  Any parent corporation and any publicly held company that own 10% or more of stocks of shares:

> None.

Dated this 7th day of January, 2025.

**CADE LAW GROUP LLC**

By: *Electronically Signed: Madison Bedder*
    Nathaniel Cade, Jr., SBN 1028115
    Annalisa Pusick SBN 1116379
    Madison Bedder SBN 1121996
    P.O. Box 170887
    Milwaukee, WI  53217
    (414) 255-3802 (phone)
    (414) 255-3804 (fax)
    nate@cade-law.com
    annalisa@cade-law.com
    madison@cade-law.com

**MOTLEY LEGAL SERVICES**

    Kimberley Cy. Motley SBN 1047193
    P.O. Box 1433
    Matthews, NC 28106
    (704) 763-5413 (phone)
    (704) 909-4100 (fax)
    kmotley@motleylegal.com

iv

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Plaintiff-Appellant furnishes the following list in compliance with Circuit Rule 26.1:

10. The full name of every party that attorney represents in this case:

> Estate of Jay Anderson, Jr., by and through Special Administrator, Starkeisha DeLaRosa and J.A., through her next friend Starkeisha DeLaRosa.

11. The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

> Cade Law Group LLC
> Motley Legal Services

12. Any parent corporation and any publicly held company that own 10% or more of stocks of shares:

> None.

Dated this 7th day of January, 2025.

**CADE LAW GROUP LLC**

Nathaniel Cade, Jr., SBN 1028115
Annalisa Pusick SBN 1116379
Madison Bedder SBN 1121996
P.O. Box 170887
Milwaukee, WI  53217
(414) 255-3802 (phone)
(414) 255-3804 (fax)
nate@cade-law.com
annalisa@cade-law.com
madison@cade-law.com

**MOTLEY LEGAL SERVICES**

By: *Electronically Signed: Kimberley Motley*
Kimberley Cy. Motley SBN 1047193
P.O. Box 1433
Matthews, NC 28106
(704) 763-5413 (phone)
(704) 909-4100 (fax)
kmotley@motleylegal.com

## **TABLE OF CONTENTS**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ...................................................ii-v

TABLE OF CONTENTS ........................................................................................ 3

TABLE OF AUTHORITIES ................................................................................... 4

JURISDICTIONAL STATEMENT .......................................................................... 8

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ................................. 9

STATEMENT OF THE CASE ............................................................................... 10

     I.    Factual Background Relevant to Appeal .............................................. 10

     II.    Procedural History ............................................................................. 13

SUMMARY OF ARGUMENT ............................................................................... 14

ARGUMENT ...................................................................................................... 16

     I.    DISPUTED    ISSUES    OF    FACT    ON    ANDERSON'S MOVEMENTS PREVENTED SUMMARY JUDGMENT ON THE FOURTH AMENDMENT CLAIM. ........................................................ 17

          A.    The District Court Sidestepped Genuinely Disputed Facts and Concluded that Anderson was Reaching for the Gun..............18

          B.    The District Court Improperly Awarded Mensah Credibility, Usurping the Role of the Jury……………………………………23

          C.    The District Court Failed to Analyze Probable Cause, Ignoring Binding Precedent and the Fact that a Gun Near a Person is Not Enough—Alone—to Permit Deadly Force……………………..25

     II.    THE    DISTRICT    COURT    ERRED    BY    ALLOWING DEFENDANT-APPELLEES    TO    FILE    AN    UNTIMELY ANSWER    AND    NOT    DEEMING    THE    COMPLAINT ALLEGATIONS ADMITTED FOR PURPOSES OF SUMMARY JUDGMENT. ....................................................................................... 28

     III.    THE DISTRICT COURT'S DECISION TO DISMISS *MONELL* WAS ERRONEOUS. ............................................................................. 34

CONCLUSION .................................................................................................... 39

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(A)(7),

FRAP RULE 32(G), AND FRAP RULE 32(C) .......................................................... 41

PROOF OF SERVICE ........................................................................................... 42

CIRCUIT RULE 30(d) STATEMENT ...................................................................... 43

TABLE OF CONTEXT TO CIRCUIT RULE 30(e) REQUIRED APPENDIX........... 44

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abdullahi v. City of Madison,*

   423 F.3d 763 (7th Cir. 2005) .............................................................. 18, 28

*Anderson v. Liberty Lobby, Inc.,*

   477 U.S. 242, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). ......................................... 16

*Barwin v. Village of Oak Park,*

   2021 WL 6882305 (N.D. Ill. Apr. 30, 2021) ............................................. 30

*Biegert v. Molitor,*

   968 F.3d 693 (7th Cir. 2020). .......................................................... 21, 22

*Burlington N. R.R. Co. v. Huddleston,*

   94 F.3d 1413  (10th Cir. 1996) ............................................................. 31

*Calhoun v. Ramsey,*

   408 F. 3d 375  (7th Cir. 2005) ............................................................. 36

*Catlin v. City of Wheaton,*

   574 F.3d 361 (7th Cir. 2009) ............................................................ 18, 28

*Central Natl. Gottesman, Inc. v. J.S. Paluch Co., Inc.,*

   2021 WL 2939968 (N.D. Ill. July 12, 2021) ............................................ 30

*Cyrus v. Town of Mukwonago,*

   624 F.3d 856  (7th Cir. 2010) ...................................................... 19, 23, 28

*Donald v. Cook County Sheriff's Dep't.,*

   95 F.3d 548  (7th Cir. 1996) .............................................................. 33

*Edelman v. Belco Title & Escrow LLC,*

   754 F.3d 389  (7th Cir. 2014) ........................................................... 31, 32

*Estate of Escobedo v. Martin,*

   702 F.3d 388 (7th Cir. 2012) ............................................................. 26

*Finkel v. Romanowicz,*

   577 F.3d 79 (2d Cir. 2009) ............................................................... 30

*Gill v. Scholz,*

    962 F.3d 360 (7th Cir. 2020) ................................................................. 16

*Glisson v. Indiana Dep't of Corr.,*

    849 F. 3d 372 (7th Cir. 2017) ................................................................. 38

*Henning v. O'Leary,*

    477 F.3d 492 (7th Cir. 2007) ................................................................. 22

*King v. Hendricks County Commissioners,*

    954 F.3d 981 (7th Cir. 2020) ................................................................. 22

*King v. Kramer,*

    680 F. 3d 1013 (7th Cir. 2012) ................................................................. 38

*Kujawski v. Board of Com'rs of Bartholomew County, Ind.,*

    183 F. 3d 734 (7th Cir. 1999) ........................................................... 34, 36

*L.A. Pub. Ins. Adjusters, Inc. v. Nelson,*

    17 F.4th 521 (5th Cir. 2021) ................................................................. 31

*Malison v. Azar,*

    2018 WL 11344411 (N.D. Ga. November 29, 2018) ............................... 31

*MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.,*

    994 F.3d 869 (7th Cir. 2021) ................................................................. 16

*McCormick v. City of Chicago,*

    230 F. 3d 319, (7th Cir. 2000) ................................................................. 36

*Med. Protective Co. of Fort Wayne, Ind. v. Am. Int'l Specialty Lines Ins. Co.,*

    911 F.3d 438 (7th Cir. 2018) ................................................................. 16

*Modrowski v. Pigatto,*

    712 F.3d 1166 (7th Cir. 2013) ........................................................... 29-32

*Moje v. Federal Hockey League, LLC,*

    792 F.3d 756 (7th Cir. 2015) ................................................................. 33

*Monell v. Dept. of Social Servs.,*

    436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) ...................... 34-38

*Muhammed v. City of Chicago,*

    316 F.3d 680 (7th Cir. 2002) ................................................................. 27

*Perez v. El Tequila, LLC*,

    847 F.3d 1247 (10th Cir. 2017) ................................................................. 31

*Pesce v. City of Des Moines*,

    439 F. Supp. 3d 1101 (S.D. Iowa 2020) ...................................................... 31

*Phillips v. Cmty. Ins. Corp.*,

    678 F.3d 513 (7th Cir. 2012) .............................................................. 18, 28

*Plakas v. Drinski*,

    19 F.3d 1143 (7th Cir. 1994) ...................................................................... 23

*REXA, Inc. v. Chester*,

    42 F.4th 652 (7th Cir. 2022) ...................................................................... 16

*Sanzone v. Gray*,

    884 F.3d 736 (7th Cir. 2018) ..............................................................passim

*Sherrod v. Berry*,

    856 F.2d 802 (7th Cir.1988) ....................................................................... 23

*Siler v. City of Kenosha*,

    957 F.3d 751 (7th Cir. 2020) ...................................................................... 24

*Smith v. Finkley*,

    10 F.4th 725 (7th Cir. 2021) ...................................................................... 20

*Tripp v. Scholz*,

    872 F.3d 857 (7th Cir. 2017) ...................................................................... 16

*Wallace v. Estate of Davies*,

    676 N.E.2d 422 (Ind. Ct. App. 1997) ......................................................... 27

*Weinmann v. McClone*,

    787 F.3d 444 (7th Cir. 2015) ..............................................................passim

*Williams v. Ind. State Police Dep't*,

    797 F.3d 468 (7th Cir. 2015) ...................................................................... 27

*Woodward v. Corr. Med. Servs. of Ill., Inc.*,

    368 F. 3d 917 (7th Cir. 2004) ...................................................................... 37

6

**Statutes**

28 U.S.C. § 1291 ...................................................................................... 8

28 U.S.C. § 1331 ...................................................................................... 8

28 U.S.C. § 1343 ...................................................................................... 8

42 U.S.C. § 1983 ...................................................................................... 8

Wis. Stat. § 167.32(2)(b). ...................................................................... 26

Wis. Stat.§ 941.29 .................................................................................. 26

**Rules**

Fed.R.Civ.P 30(b)(6) ........................................................................ 33, 34

Fed.R.Civ.P. 12(a)(4) ............................................................................ 29

Fed.R.Civ.P. 56 ............................................................................... 16, 30

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arose under the United States Constitution and pursuant to 28 U.S.C. § 1343 because relief is sought under 42 U.S.C. § 1983 for a violation of the Fourth and Fourteenth Amendments to the United States Constitution. The United States Court of Appeals for the Seventh Circuit has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291, as this is an appeal from a final judgment or order of the United States District Court for the Eastern District of Wisconsin.

On August 8, 2022, Plaintiffs-Appellants consolidated three cases related to the estates and relatives of three individuals who were fatally shot and killed on three separate occasions by defendant and former Wauwatosa Police Officer Joseph Mensah. R. 42 (in E.D. Wisconsin Case No. 21-CV-1179). Consolidation was granted for pretrial matters only.

The lead case at the time of this appeal is *the Estate of Alvin Cole v. Joseph Mensah*, E.D. Wisconsin Case No. 21-CV-848. However, this appeal relates to the Order granting Defendants' Motion for Summary judgment in the Estate of Jay Anderson, Jr. on March 14, 2024, and Plaintiffs' Motion for Reconsideration of the Estate of Jay Anderson, Jr. R. 125.[1] The order appealed from was entered by the Court, through the Honorable Lynn Adelman, on March 14, 2024. R. 125. Plaintiffs filed their Motion for Reconsideration on March 15, 2024, which stayed the deadline

---

[1] The original case number for the Estate of Jay Anderson Jr., is E.D. Wis. Case No. 21-CV-1179. The record citations contained herein are in the *Estate of Alvin Cole v. Joseph Mensah*, et al, E.D. Wis. Case No. 21-CV-848, unless noted otherwise.

to timely file an appeal until the Court decided Plaintiffs' motion. R. 127. The Court denied Plaintiffs' Motion for Reconsideration on October 18, 2024. R. 139.

Defendant-Appellees have remaining pending claims solely as to The Estate of Alvin Cole. R. 140. As it relates to the Estate of Jay Anderson, Jr., no issues remain before the district court. The Estate of Jay Anderson, Jr. timely filed its Notice of Appeal on October 21, 2024. R. 141. The Estate of Jay Anderson Jr. timely filed an Amended Notice of Appeal on November 8, 2024, and an Amended Docketing Statement on November 12, 2024. R. 147, 149.

### STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether the district court erroneously granted summary judgment in favor of Mensah and in dismissed Anderson's Fourth Amendment claim;

2.      Whether the district court erred by allowing Mensah to file a late answer and by preventing the factual assertions to be deemed admitted as true after discovery closed for purposes of summary judgment (Compare R. 78 with R. 126); and,

3.      Whether the district court's dismissal of *Monell* was erroneous.

## <u>STATEMENT OF THE CASE</u>

### I.     **Factual Background Relevant to Appeal**

This is an excessive deadly force case that was entirely avoidable. And as a result, we mainly have Mensah's testimony—and credibility—to rely on. Mensah did not capture the interaction because he failed to engage his emergency squad lights while approaching Anderson's non-moving vehicle. R. 114 ¶¶ 22, 25. Only after discharging his weapon six times and killing Anderson did Mensah hit his lapel mic to capture approximately 30 seconds of muted video prior to the shooting. R. 114 ¶ 25. Mensah had the ability and was, per training, required to engage his lapel mic or squad footage sooner because every Wauwatosa Police officer was outfitted with a microphone that could record audio and had the ability to engage squad lights to begin recording with a device on their person. R. 91-1 at 82:21-23; R. 91-2 at 34:9-11; R. 91-4 at 53:24-25; 54:1-2.

Former Wauwatosa Officer Joseph Mensah shot and killed Jay Anderson, Jr. in the early morning of June 23, 2016. R. 92 ¶¶ 74-76. Anderson was asleep in a parked vehicle from approximately 1:30 a.m. to 3:00 a.m. in Madison Park in the City of Wauwatosa, Wisconsin until Mensah awoke him. R. 91-1 at 18:6-8, 102:9-11, 103:18-21.

Around 3:00 a.m., Mensah observed Anderson's car, and approached Anderson's vehicle in the park but he did not engage his squad car's emergency lights. R. 47, ¶ 91-93; R. 91-1 at 22:7-22, 34:5-14, R. 91-16. Not only would the squad's emergency lights have automatically started the squad dashboard camera to capture

the unfolding interaction by video and audio, but it is also required to be turned on by Wauwatosa Police Department policy. *Id*.

Before engaging with Anderson, Mensah called dispatch to alert them of an occupied vehicle in the park and provided the vehicle's license plate number to them. R. 91-1 at 48:3-6. Dispatch confirmed to Mensah that the vehicle was not stolen and identified the owner as Olena Delarosa, the mother of Anderson's fiancé, Starkeisha DeLaRosa. R 47, ¶¶ 9-10.

Mensah walked up to the occupied vehicle and knocked on the passenger window. R. 92 ¶ 8. Anderson was asleep, and the knocking on the passenger window woke Anderson up; Anderson turned the ignition on and rolled down the passenger side window after waking up. R. 92 ¶¶ 8-9. Mensah claims he asked Anderson for his identification and that Anderson stated he did not have any, yet identification was later found in Anderson's pocket. R. 92 ¶ 10.

Anderson had an unloaded firearm, that he had a license to carry for, inside the parked car on the passenger seat. R. 92 ¶¶ 15-17, 40. Wisconsin is an open carry state. R. 92 ¶¶ 15-16, R 79 ¶¶ 87-88. A gun is considered "not concealed" and therefore "open" if it is visible and not concealed in any way. R. 91-1 71:4-72:23. Mensah observed the gun in the front passenger seat. R. 92 ¶¶ 11. And at 3:05 a.m., Mensah communicated to dispatch to "step it up" because Mensah observed the gun in Anderson's vehicle. R. 91-1 78:14-23.

Throughout the entire encounter, Anderson did not touch the weapon and was not committing a violent crime. R. 79 ¶ 42; R. 114 ¶ 39. Mensah shouted

repeated commands at Anderson to not touch the weapon and to keep his arms raised in the air. R. 93 ¶ 43; R. 114 ¶ 8. Anderson complied with Mensah's commands by raising his arms in the air while Mensah had his service weapon unholstered and pointed at Anderson. R. 91-1 at 58:8-59:17; R. 92 ¶¶ 8, 14; R. 114 ¶¶ 8, 14. Although Mensah testified that Anderson lunged towards the gun, the muted squad footage does not show that both of Anderson's hands dropped towards the gun. R. 91-1 at 112:10-13; R. 114 at ¶ 20; App C. (Joseph Mensah Squad Video) at 03:07:13.

The squad video shows that Anderson's hands are raised, dipping only slightly—while he appears to be speaking with Mensah and motioning as if he was asking for permission. R. 92 ¶ 20; App C. at 3:07:10-13. Mensah acknowledged that Anderson might not have been reaching for the gun and Anderson could have been reaching for his cell phone, car registration, or other items located in the passenger area. R. 92 ¶¶ 23-24, 54; R. 91-1 at 95:20-23; R. 91-2 at 92:11-13. At approximately 3:07:15 a.m. Mensah fired his weapon six times at Anderson despite Anderson not possessing the gun. R. 91-1 at 82:8-23, see also App. C.

After 25-30 seconds, Mensah alerted dispatch that shots were fired and that the suspect was down. R. 92 ¶ 21. Approximately forty-five seconds after Mensah shot Anderson, at 3:08 a.m., back up officers Slayers and Mills arrived at the scene. R. 93 ¶ 54. Around 3:11:55 a.m., Salyers alerted dispatch that Anderson was not breathing. R 92 ¶ 95; R. 114 ¶ 95. At 3:12:02 a.m., Salyers orders Mills to grab the gun from the passenger seat but neither of them remembers the gun's positioning in the car. R. 92 ¶¶ 44-47; R. 114 ¶¶ 44-47; R. 93 ¶ 59. They did not remove Anderson's

other belongings, such as Anderson's cellphone or monies, from the front passenger seat. R. 92 ¶ 11. After removing the gun, Salyers and Mills then removed Anderson from the vehicle and the Wauwatosa medical unit began administering care to Anderson. R. 92 ¶ 45; R. 114 ¶ 32; R. 93 ¶ 61. None of the officers recall the gun's location or position before it was removed—nor is there a single photograph of Anderson's body or the gun on the scene. R. 114 ¶¶ 34, 42, 44, 46-47, 49, 51.

## II. Procedural History

The Estate of Jay Anderson, Jr., by Special Administrator, Starkeisha DeLaRosa and J.A., a minor child, through her next friend Starkeisha DeLaRosa (collectively, "Plaintiffs"), filed this lawsuit on October 13, 2021, and alleged that then Officer Joseph Mensah, Barry Weber, and the City of Wauwatosa, violated Anderson's constitutional rights under Section 1983. R. 1 (21-CV-1179). Plaintiffs subsequently filed an Amended Complaint on August 24, 2022. R. 47 (21-CV-1179).

 Defendants filed a Motion to Dismiss on September 7, 2022. R. 50-51 (21-CV-1179). The motion to dismiss was denied in part and granted in part. R. 56 (21-CV-1179). Associated cases were consolidated for pretrial purposes on September 21, 2022. R. 34.

Mensah failed to timely file an Answer to the Amended Complaint within the time required by the Federal Rules of Civil Procedure. Once the issue of that failure was raised in opposition to the motion for summary judgment, Mensah moved to extend time to file an answer. R. 100. The district court found that Defendant's failure to answer more than four months after the amended complaint and their motion for

summary judgment was filed, was excusable neglect. R. 125, 5. On March 14, 2024, the district court dismissed Anderson's claims in its entirety on the grounds that it believed, after its review of a grainy, audio-less video, coupled with Mensah's testimony and ultimately his credibility, that Mensah had a reasonable belief that Anderson was reaching for a gun and thus Mensah did not use excessive force. R. 125.

## SUMMARY OF ARGUMENT

In granting Mensah's motion for summary judgment, the district court made factual determinations on the evidence, utterly failed to consider disputed issues of material fact, erred in applying controlling precedent, and improperly awarded Mensah credibility against a deceased victim. The district court's erroneous decision to grant summary judgment should be reversed for three reasons.

First, the district court improperly granted summary judgment on Anderson's Fourth Amendment claim. The district court improperly usurped the role of the jury and made factual determinations on the video evidence that Anderson was reaching for the gun. The court failed to consider Mensah's own sworn deposition testimony admitting that Anderson could have been reaching for his phone rather than the empty gun on the front seat. This testimony suggests clearly that the specific reason for Anderson's movement toward the front seat is a genuine issue of material fact that should be presented to a jury. Any determination from the district court was rooted in an improper credibility assessment and exercise of fact finding. Furthermore, Wisconsin allows citizens to open carry and thus the simple measure

of possessing a weapon, all other factors being equal, is not and should never be a death sentence.

Second, the district court erred in determining that Mensah's failure to file an answer to the amended complaint was excusable neglect. Despite Anderson's request that the unanswered factual assertions be deemed admitted for purposes of summary judgment, the district court accepted an answer four months after its original deadline. Anderson purposely did not seek a customary default judgment because he wishes to proceed to trial on the merits. The district court's conclusion was in error and should be reversed.

Third, the district court's decision to dismiss *Monell* was erroneous. Mensah's prior deadly use of force and Wauwatosa's failure to protect the community against future harms at the hands of Mensah by ignoring clear warning signs illustrates a perpetual ignorance to its officers' mental health, rising to an unconstitutional policy or practice. Mensah's devastating conduct while on duty should have triggered a department-wide acknowledgment of its policies—or lack thereof—in ensuring that its officers are properly treated after a deadly shooting. Its failure to follow procedure and amend the policies that were not working, serves as pattern or practice of condoning unconstitutional conduct.

Each of these theories highlight where the district court erred in relation to the evidence and further suggests that the district court incorrectly viewed the evidence in the light most favorable to Mensah. Therefore, because the district court

cherry-picked events and usurped the role of the factfinder, its decision granting Defendants' motion for summary judgment should be reversed.

## **ARGUMENT**

The Seventh Circuit reviews a district court's grant of summary judgment de novo. *REXA, Inc. v. Chester*, 42 F.4th 652, 662 (7th Cir. 2022). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

When summary judgment is granted in favor of a defendant-appellee, the appellate court construes the facts in the light most favorable to and draws all reasonable inferences in plaintiff-appellant favor. *Med. Protective Co. of Fort Wayne, Ind. v. Am. Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018); *Gill v. Scholz*, 962 F.3d 360, 363 (7th Cir. 2020) (citation omitted). An inference is reasonable when it is not directly contradicted by direct evidence at the summary judgment stage. *See MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.,* 994 F.3d 869, 876 (7th Cir. 2021) (citation omitted).

Summary judgment is only appropriate where all the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits shows no genuine dispute to material fact. Fed. R. Civ. P. 56(a). In this case, it was impossible for the district court to have construed all the facts in the light most favorable to

Anderson, because it did not consider a vast majority of evidence contained in affidavits, deposition transcripts, and other evidence provided in the record. Its decision should be reversed.

## I.   DISPUTED ISSUES OF FACT ON ANDERSON'S MOVEMENTS PREVENTED SUMMARY JUDGMENT ON THE FOURTH AMENDMENT CLAIM.

This appeal centers on Mensah's excessive, deadly force executed against Anderson. Mensah and the district court shockingly excused the following testimony from Mensah's deposition:

> Attorney Cade:     So it's fair to say that today you can't definitively state that Mr. Anderson was reaching for a gun as opposed to for his phone, fair?
>
> Mensah:           Fair.



R. 92, ¶ 23-24, R. 90, at 2.

17

Several reversible flaws existed in the district court's decision to grant summary judgment. The district court sidestepped genuine issues of material disputed facts, awarded credibility overwhelmingly in Mensah's favor, and incorrectly applied the probable cause analysis by overlooking that Wisconsin is an open carry state and that law-abiding citizens possessing a weapon does not and should not—alone—allow officers to choose deadly force. The district court also found the Appellees' failure to file an operative answer as excusable neglect and held that *Monell* liability is not available as a remedy. These errors, as discussed below, require reversal.

### A. The District Court Sidestepped Genuinely Disputed Facts and Concluded that Anderson was Reaching for the Gun.

For good reason, this Court cautions against granting summary judgment when faced with deadly excessive force claims, especially when the victim has been killed by the defendant-officer, as the parties' versions of the truth differs tremendously. *See Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (holding that "since the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'") (quotations omitted); *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 n. 4 (7th Cir. 2012) (". . . summary judgment is frequently inappropriate in excessive force cases."); *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009) (The "reason that summary judgment is often inappropriate in excessive force cases is that the parties typically tell different

18

stories about what happened"); *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (discussing prudential concern against granting summary judgment in excessive force cases are "particularly relevant" where plaintiff has died "because the witness most likely to contradict the officer's testimony—the victim—cannot testify"). Yet, the district court's conclusion was to the contrary to this Circuit's steadfast precedent as it improperly awarded credit to Mensah's version of the facts and usurped the role of the jury. Anderson being deceased plays a critical role in the analysis and should have prevented summary judgment from being entered.

The district court also made factual determinations, which it is prohibited from doing at the summary judgment phase, from on the muted video recording. The video shows Anderson with his hands up in the vehicle. The video also depicts Anderson's hands, while raised, moving, although it is not clear what he is doing. However, the district court determined that he believed that Anderson's hands were moving to reach for the gun on the front seat, as opposed to the cell phone or other item. The district court erroneously abandoned all other potential reasons proffered to explain Anderson's movements within the vehicle simply by finding that Mensah's actions were reasonable. R. 125, p. 9. It is one thing to suggest that Anderson's hands or his right arm could have moved as observed on the dash cam video; however, it is another concept entirely for the district court to opine as to the *factual reasons* for Anderson's arm to dip. R. 125. Perhaps Anderson was looking for the car registration, as Mensah requested him to provide, to prove that the car was not stolen. Perhaps Anderson was reaching for his cell phone to record his interaction with a police officer considering

he is a Black male in America facing an officer pointing a loaded gun at him after being awoken abruptly. Perhaps Anderson was reaching for nothing at all but struggled to keep his hands raised for several minutes.

Anderson presented all of these various reasons to the district court. These other reasons served as genuine issues of material fact that should have prevented summary judgment because they are triable issues for a jury, not a judge. Yet, the district court, despite claiming that the video evidence clarifies any disputed issues of fact, awarded Mensah's "reasonable belief" with astounding credibility. R. 125, p. 8-9. The district court held that "[t]he footage **confirms** that Anderson lowered his right hand in the direction of the passenger seat" and goes on to accept that Mensah's only reasonable belief in that moment is that Anderson was reaching for the weapon. *Id.* (emphasis added). But that is neither indisputably true, nor the correct legal standard to be applied.

When analyzing a deadly force claim, courts focus on the danger posed by the person to whom the force was applied. *Biegert v. Molitor*, 968 F.3d 693, 699 (7th Cir. 2020). This requires asking "whether a reasonable officer in the circumstances would have probable cause to believe that the suspect poses an *immediate* threat to the safety of the officers or others." *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018) (emphasis added). As a general matter, "[i]f the suspect threatens the officer with a weapon, deadly force may be used." *Id*. And although Anderson lowered his right hand, Mensah's conduct must be analyzed through the lens of a reasonable officer. *Smith v. Finkley*, 10 F.4th 725, 733–34 (7th Cir. 2021) ("an officer's actions must be

assessed from the perspective of a reasonable officer on the scene."). Mensah's subjective belief that Anderson purportedly was reaching for the gun has <u>no</u> place in the district court's, or this Court's, analysis. *See, e.g., Weinmann v. McClone*, 787 F.3d 444, 447, 449 (7th Cir. 2015) (upholding district court denial of summary judgment because there was a dispute over whether the plaintiff was holding the gun and reasoning that "it does not matter for purposes of the Fourth Amendment that [the officer] subjectively believed that his life was in danger.").

The district court improperly credited Mensah's purported subjective belief. Specifically, that is because a reasonable jury could find that Anderson was trying to comply with Mensah's previous orders. *Smith*, 10 F.4th at 734 (affirming denial of summary judgment on deadly force claim because a reasonable jury could conclude that the officers shot an unarmed man). In fact, Mensah testified that he could not remember what exact orders he gave Anderson that night. *See* R. 114, ¶ 8.

> Q:    So, he made a reason, and you said "put your hands up?
>
> A:    I can't remember if it was put your hands up or don't reach for that or what exactly I said, but I told him not to reach for the gun."
>
> Q:    Okay. And you instructed him to put his hands up?
>
> A:    I can't remember if it was up or don't reach for it, I can't remember. I don't remember if it was "Let me see your hands," "Put your hands up," "Don't reach for it." I can't remember what I said.

R. 114, ¶ 8.

It also is undisputed that Mensah asked for Anderson's driving license or registration. R. 114, ¶ 10 ("Mensah asked Anderson for either a driver's license or

identification, he did not remember which one." (R 77-6, at 38:23-25, 39:10-14)). And most importantly, there was no evidence that Anderson posed an *immediate* threat to Mensah. *Cf. King v. Hendricks County Commissioners*, 954 F.3d 981, 985 (7th Cir. 2020) (holding that the officers reasonably applied deadly force when the decedent "pointed a large knife at [the officers], disregarded their repeated commands to drop the knife, *and then charged*" at the officers)(emphasis added); *Weinmann v. McClone*, 787 F.3d 444, 447 (7th Cir. 2015) (holding that the case turned on whether the man had threatened the officer with the shotgun—*if he had not, it was unreasonable for the officer to shoot him*) (emphasis added); *Biegert,* F.3d at 447 (holding deadly force was reasonable when decedent threatened to use the knife and already stabbed an officer multiple times); *Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007) (holding deadly force was reasonable because the officer felt the decedent holding the gun and what he believed to be a finger reaching for the trigger); *Sanzone,* F.3d at 740 (holding the officer "did not violate [the plaintiff's] Fourth Amendment right by defending himself and other officers once [plaintiff] pointed a gun at them.").

Anderson was not touching the gun. Anderson was not pointing the gun toward Mensah. And it is heavily disputed whether Anderson was even reaching for the gun at all. Thus, the district court's conclusion that Anderson posed an immediate threat to Mensah because Anderson "was reaching for the gun" is not only disputed, but it also improperly usurped the jury's role. As recent as four years ago, this Court has repeatedly "emphasize[d] that someone does not pose 'an immediate threat of serious harm' solely because he is armed." *Biegert*, 968 F.3d at 700, citing *Weinmann*, 787

22

F.3d at 447. And the fact that Anderson was not armed at the time Mensah executed him requires this Court to reverse the grant of summary judgment and send this case to the jury.

### B. The District Court Improperly Awarded Mensah Credibility, Usurping the Role of the Jury.

Mensah during summary judgment briefing and likely again during this appeal will characterize Anderson's movement as a "lunge" or a quick movement. However, that is not the case, and Anderson urges this Court to examine the video evidence and see for itself whether Anderson's movement aligns to that characteristic. Regardless of Anderson's variety of extremely valid and plausible options put forward to the district court, it chose to commandeer the role of a jury in making a credibility determination. *See Cyrus*, 624 F.3d at 862 (discussing how prudential concern against summary judgment in excessive force cases is "particularly relevant" where plaintiff has died "because the witness most likely to contradict the officer's testimony—the victim—cannot testify").

In deadly force cases, "where the officer defendant is the only witness left alive to testify. . . a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial." *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994). "The award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify." *Plakas*, 19 F.3d at 114. The case should have gone to a jury because plaintiffs are free to challenge the veracity of

an officer-defendant's account of what he knew. *Sherrod v. Berry*, 856 F.2d 802, 806 (7th Cir.1988) (en banc) ("The veracity of [an officer's] testimony and the reasonableness of his actions based upon the totality of the information he possessed at the time of the shooting are questions we leave for a properly informed and instructed jury on remand.").

Considering that Anderson and Mensah are the only two individuals who know precisely what occurred on the night Anderson was shot–and the fact that Anderson was dead and for purposes of summary judgment–Mensah's version of the facts should have been taken less favorably. Yet, the district court misapplied the law and quite clearly got it wrong. *See Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020) ("Summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations," particularly where "the one against whom force was used has died, because the witness most likely to contradict the officer's testimony—the victim—cannot testify.").

In granting summary judgment, the district court had to make a factual determination on what Anderson was reaching for, if anything. Instead of making a reasonable inference in favor of Anderson and concluding that it is possible that Anderson could have been reaching for his license or registration like Mensah had asked of Anderson, the district court credited Mensah's version of events. Again, a jury is the proper party to sift through the possibilities that were presented to Mensah

on the night he shot and killed Anderson. Preventing a jury from assessing those possibilities was improper, and this Court should reverse.

**C.    The District Court Failed to Analyze Probable Cause, Ignoring Binding Precedent and the Fact that a Gun Near a Person is Not Enough—Alone—to Permit Deadly Force.**

The district court similarly failed to contemplate probable cause, perhaps because it did not exist, and instead moves its analysis straight to reasonableness. "When addressing the use of deadly force, the court considers whether a reasonable officer in the circumstances would have probable cause to believe that the [person] poses an immediate threat to the safety of the officers or others." *Sanzone*, 884 F.3d at 740.

The facts are clear that Anderson was not posing a significant threat of death or serious physical injury to Mensah or others. R. 92, ¶¶ 39-40. Mensah and Anderson are seen on video briefly speaking to one another and at no point did Anderson *ever possess the gun*. R. 91, ¶ 20; see also App. C (Mensah Squad Video). The empty gun sat unmoved and untouched on the passenger seat of the vehicle while Anderson slept, while Mensah approached the passenger window, and throughout the entire encounter. R. 91, ¶ 20; see also App. C (Mensah Squad Video). Thus, for the district court to swiftly conclude that Mensah not only had probable cause (without any true analysis), and conclude that a visible gun allows an officer to open fire, is erroneous. R. 125, p. 6-7. Neither Mensah nor the district court cites a case supporting the theory that an officer is allowed to execute someone because the officer saw a gun next to a law-abiding citizen. The district court instead determined that Mensah's conduct was reasonable because it awarded Mensah greater credibility.

Additionally, Wisconsin is an open carry state.[2] Anderson was not a felon, he was not fleeing a crime, nor was he a danger to anyone in the park where he was sleeping. Instead, Mensah arrived on scene and observed a parked vehicle with a sleeping individual inside. Only after awaking Anderson, having a limited discussion with him, which included asking for his identification, and spotting a lawful gun on the passenger seat, does Mensah go on the offense and escalate the situation. R. 92, ¶ 10-11, 14.

"It does not matter for purposes of the Fourth Amendment that [the officer] subjectively believed that his life was in danger." *Weinmann,* 787 F.3d at 447, 449 (upholding district court denial of summary judgment because there was a dispute over how the plaintiff was holding the gun, i.e., whether plaintiff was holding and aiming the gun at the officer). "[The officer] did not violate [the plaintiff's] Fourth Amendment right by defending himself and other officers *once [the plaintiff] pointed a gun at them*." *Sanzone,* 884 F.3d at 740 (emphasis added). Precedent is clear that deadly force is only permitted when there is an imminent threat—usually, that is satisfied when a person points a gun at an officer. *See, e.g.*, *Weinmann*, 787 F.3d at 449–50 (7th Cir. 2015) ("[I]f [the suspect] had the gun raised to his shoulder and pointed at [the officer], then [the officer] would have been justified in using deadly force and hence entitled to qualified immunity"); *Estate of Escobedo v. Martin*, 702

---

[2] A person cannot carry a firearm if convicted of a felony, or found not guilty by mental disease or reason of insanity, was committed for treatment, was subject to an order not to possess a firearm, or is subject to an injunction for domestic abuse. Wis. Stat. § 941.29 (1m)(a)(-(g)– a. Under Wisconsin law, a person may transport a loaded or unloaded handgun in a vehicle. Wis. Stat. § 167.32(2)(b).

F.3d 388, 410–411 (7th Cir. 2012) (officer entitled to qualified immunity for shooting suspect who pointed gun at officers while trapped in an apartment); *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (officer received qualified immunity for shooting suspect who aimed gun at officers). When suspects do not pose a threat of bodily harm, deadly force violates a plaintiff's Fourth Amendment rights. *Sanzone,* 884 F.3d at 740, citing *Williams v. Ind. State Police Dep't,* 797 F.3d 468, 482–83 (7th Cir. 2015) (because of fact dispute, the court could not credit officers' testimony that suspect threatened them with knife); *Wallace v. Estate of Davies*, 676 N.E.2d 422 (Ind. Ct. App. 1997) (suspect did not point gun at officers).

Here, the district court concludes that Mensah obtained a reasonable belief that his safety was in *imminent* danger, despite Mensah "radioing to inform other officers about the gun" that was fully visible on the passenger seat, which was never moved nor touched, and despite the video evidence showing Anderson's movements as lethargic at best. R. 125. This conclusion is not only wrong but wholly contrary to the evidence. This Court's precedent distinguishes cases where a victim is in *true possession* of a weapon, versus simply observing a weapon. *Compare Sanzone*, 884 F.3d at 740 (holding the officer "did not violate [the plaintiff's] Fourth Amendment right by defending himself and other officers once [plaintiff] pointed a gun at them.") *with Weinmann*, 787 F.3d at 449-50 (upholding district court denial of summary judgment because there was a dispute over whether the plaintiff was holding the gun and pointing it at the officer).

27

The district court's duty to take the facts in the light most favorable to Anderson was disregarded. The video evidence shows conflicting versions of the truth—Anderson contends strongly that his movements were languid and non-threatening, offering a multitude of explanations for his decision to move toward the passenger seat, such as possibly complying with Mensah's order to hand over his license or registration, and Mensah claims his life was in imminent danger simply by viewing a gun—are clearly factual disputes that are ripe for jury determination. This Court has scrutinized deadly force cases, reversing summary judgment, because it understands the overwhelming material disputes that arise. See *Abdullahi*, 423 F.3d at 774 (holding that "we have held on many occasions that summary judgment . . . in excessive force cases should be granted sparingly."") (quotations omitted); *Phillips*, 678 F.3d at 520 n. 4 (". . . summary judgment is frequently inappropriate in excessive force cases."); *Catlin*, 574 F.3d at 367 (The "*reason* that summary judgment is often inappropriate in excessive force cases is that the parties typically tell different stories about what happened"); *Cyrus*, 624 F.3d at 862 (discussing that summary judgment should not be granted where plaintiff has died "because the witness most likely to contradict the officer's testimony—the victim—cannot testify"). This case is no different, especially considering the only other witness to the shooting is the deceased victim. For these reasons, this correcting Court should reverse summary judgment to allow this case to proceed to trial.

## II.    THE DISTRICT COURT ERRED BY ALLOWING DEFENDANT-APPELLEES TO FILE AN UNTIMELY ANSWER AND NOT DEEMING THE COMPLAINT ALLEGATIONS ADMITTED FOR PURPOSES OF SUMMARY JUDGMENT.

Under current Seventh Circuit precedence, the district court erred by not finding that Appellees failure to file an answer to the complaint was an admission of the facts as alleged in the Amended Complaint for purposes of summary judgment. More specifically, Appellees failed to timely file an answer within fourteen days after the district court partially denied their motion to dismiss. Fed. R. Civ. P. 12(a)(4); R. 54. In response to the Appellees' motion for summary judgment, Appellants raised the issue that because the Appellees failed to file an answer more than four months after the district court denied their motion to dismiss, that, consequently, Appellees admitted all of the facts in the Amended Complaint, at least for purposes of summary judgment. R. 90, at 9-11. The district court disagreed, as it denied the Appellants' request to find that Appellees had admitted all of the facts in the Amended Complaint, solely as to the issue of summary judgment and permitted the Appellees to file a late answer. R. 125. The district court is in error.

This Court has made it clear that the failure to timely file an answer after the denial of a motion to dismiss means the allegations in the complaint are deemed admitted for purposes of summary judgment. *Modrowski v. Pigatto,* 712 F.3d 1166, 1170 (7th Cir. 2013)("Indeed, Modrowski might have ***conclusively established*** most of the material facts alleged in his complaint simply by highlighting the defendants' failure to file a timely answer to his first amended complaint. . . The defendants' unorthodox strategy of responding to Modrowski's first amended complaint with a motion for summary judgment, unaccompanied by any other responsive pleading, was thus risky, because Modrowski could have pointed to "admissions on file" to

29

support his allegations.")(citation omitted). *See also* Fed. R. Civ. P. 56 advisory committee's notes, 2010 Amendments, Subdivision (e)(3) ("Once the court has determined the set of facts - both those it has chosen to consider undisputed for want of a proper response or reply and any that cannot be genuinely disputed despite a procedurally proper response or reply - it must determine the legal consequences of these facts and permissible inferences from them).

In a prior case, this Court affirmed the grant of summary judgment in favor of plaintiff where defendant failed to timely answer the complaint after eight months. *Barwin v. Village of Oak Park*, 2021 WL 6882305, *1 (N.D. Ill. Apr. 30, 2021)("There is a distinction between relying on the *allegations* in the complaint . . . and relying on the defendant's *admission* of those allegations. Barwin has done the latter." (italics in original)), *aff'd in part, rev'd in part and remanded*, 54 F.4th 443 (7th Cir. 2022)(affirming the grant of summary judgment to plaintiff based on facts deemed admitted where the Defendant failed to answer); *see also Central Natl. Gottesman, Inc. v. J.S. Paluch Co., Inc.,* 2021 WL 2939968, *4, n. 6 (N.D. Ill. July 12, 2021)(deciding that the failure to file an answer deems the factual allegations in the complaint as true and a plaintiff can rely on those admissions to defeat a defendant's summary judgment motion), citing *Modrowski*.

And importantly, this Court is not alone in finding the allegations in the original complaint deemed admitted for the failure to timely answer. *See, e.g., Finkel v. Romanowicz*, 577 F.3d 79, 81 n.1 (2d Cir. 2009)(noting a defendant "is therefore deemed to have admitted all well-pleaded allegations in the complaint pertaining to

liability" by failing to file an answer); *L.A. Pub. Ins. Adjusters, Inc. v. Nelson*, 17 F.4th 521, 526-27 (5th Cir. 2021)(reversing district court's decision to allow defendant to file an untimely answer because it "was unfairly prejudicial to [the plaintiff]" and reserving summary judgment in favor of the defendant because the defendant's failure to file an answer deemed the allegations in the complaint admitted); *Burlington N. R.R. Co. v. Huddleston*, 94 F.3d 1413, 1415 (10th Cir. 1996)("By failing to submit an answer or other pleading denying the factual allegations of Plaintiff's complaint, *Defendant admitted those allegations, thus placing no further burden upon plaintiff to prove its case factually*.")(emphasis added); *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1254 (10th Cir. 2017); *Pesce v. City of Des Moines*, 439 F. Supp. 3d 1101, 1108-1109 (S.D. Iowa 2020); *Malison v. Azar*, 2018 WL 11344411, *7 (N.D. Ga. November 29, 2018), citing *Modrowski*.

Finally, it is important to note that Appellants here *did not move* for a default judgment against the Appellees, which would have implicated the district court's discretion to allow Appellees to file a late answer. Appellants did not move for default judgment because it wants a trial on the merits, and not so that "one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Edelman v. Belco Title & Escrow LLC*, 754 F.3d 389, 395 (7th Cir. 2014) (citations omitted).

In *Edelman*, the plaintiff filed a fourth amended complaint that the defendants failed to answer, and when the defendants moved for summary judgment and it was granted, the plaintiffs, on appeal, complained that the district court should have

31

denied summary judgment. *Id.* This Court noted there was no prejudice to the plaintiffs because the second, third and fourth amended complaints "stated the very same allegations against [the defendant]." *Edelman*, 754 F.3d at 394-95. Further, this Court noted that "the purpose of a responsive pleading is to put everyone on notice of what the defendant admits and it intends to contest." *Id.*, at 395.

But that is not the case here, as the original complaint and amended complaint are different. R. 1 (in case 21-cv-1179) and R. 47 (in case 21-cv-1179). The original complaint had four legal claims; the amended had nine. In essence, the amended complaint added a failure to train and supervise, two different loss of society and companionship claims, as well as a deliberate indifference and a *Monell* claim. *Id.* The district court's decision on the motion to dismiss clearly kept in aspects of the loss of society and companionship claims that were not part of the original complaint, and which Appellees should have had to answer.

Rather than deem the factual allegations admitted, the district court determined that Appellees had shown excusable neglect. R. 125, at 5. Again, the district court erred.

There is no excusable neglect. The error of the district court was its automatically assuming that no harm befell the Appellants because "Plaintiffs knew that defendants disputed their factual allegations." R. 125, at 5. But there is harm to Appellants here in that Appellants did not get the benefit of an admission of all of the material factual allegations in a light most favorable to them. *Modrowski,* 712 F.3d at 1170.

As noted to the district court, courts should take the burden of showing "excusable neglect" seriously lest parties ignore deadlines with impunity. *Donald v. Cook County Sheriff's Dep't.,* 95 F.3d 548, 558 (7th Cir. 1996). While the district court has discretion to control its docket, the granting of an extension of time to file a late answer under the guise of "excusable neglect" for an administrative oversight is trivial. All the Appellees stated in moving for the extension was the failure to file an answer was an "oversight." But, excusable neglect requires more than just a blanket statement that the omission was oversight. *Moje v. Federal Hockey League, LLC*, 792 F.3d 756, 759 (7th Cir. 2015). Indeed, all of the factors in *Moje* counseled the district court against an extension of time, especially where the Appellants did not seek a default judgment in responding to the motion for summary judgment, and instead only sought to hold Appellees to the facts, as alleged.

But the failure to respond was not an oversight. Appellees' counsel received a corporate deposition notice, pursuant to Fed. R. Civ. P 30(b)(6), on March 23, 2023, which notice specifically noted that a City of Wauwatosa corporate representative be prepared to discuss, among other things: "[T]he factual bases for Wauwatosa's *answers* to the Antonio Gonzales, Jay Anderson and Alvin Cole complaints, *including Affirmative Defenses*." R. 103, at Ex. 1, at 4. Appellees produced a witness, Attorney Hanna Kolberg, on May 23, 2023 to testify as the Wauwatosa corporate designee. R. 103, at Ex. 2, at 4:24-8:10. Thus, in theory, Appellees produced a witness, an attorney no less, who should have been able to testify about an answer that was never filed with the district court. The district court erred for finding excusable neglect where

Appellees admitted that they produced a witness to testify at the 30(b)(6) deposition *more than 6 weeks after* the Court's decision (R. 54) who could not have been prepared to testify because she could not have reviewed any such answer *as there were no amended answer for her to review*. Defendants are not guilty of excusable neglect; Defendants are guilty of flaunting the rules.

## III.   THE DISTRICT COURT'S DECISION TO DISMISS *MONELL* WAS ERRONEOUS.

The district court erred in granting summary judgment as to *Monell* and failed to analyze this claim. R. 125; R. 125. Municipalities and local governments can be liable for Section 1983 claims. *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d. 611 at 690 (1978); *Kujawski v. Board of Com'rs of Bartholomew County, Ind.*, 183 F. 3d 734, 737 (7th Cir. 1999). Mensah's prior deadly use of force and Wauwatosa's failure to protect the community against future harms at the hands of Mensah by ignoring clear warning signs illustrates a perpetual ignorance to its officers' mental health, rising to an unconstitutional policy or practice.

The lower court erroneously noted that after Mensah's shooting of Antonio Gonzales but prior to Mensah's shooting of Jay Anderson, Jr., which were eleven months apart, Mensah was "investigated internally" and "evaluated by a specialist prior to his return to patrol," consistent with officer-involved shooting policy R. 131 at 6. This is inaccurate. Former Wauwatosa Chief of Police, Barry Weber, as the policymaker for the Wauwatosa Police Department, testified that after a shooting, part of the procedure to determine whether he approves an officer going back out on the streets, would include a fitness for duty assessment by a psychologist or

psychiatrist and an internal investigation with the Wauwatosa Police Department. This procedure includes a conversation with Mensah to evaluate whether proper policies and procedures were followed. R. 77-2 at 239:17-21, 278:13-17, 86; R. 77-3 at 89: 22-24; R. 92 at 71; R. 77-7 at 62:14-17; R. 92 at 62. This policy was not followed; after the Antonio Gonzales shooting as neither a fitness for duty assessment nor a proper internal investigation were conducted. Below is a timeline of important events:

| December 1, 2014 | Psychologist conducts a pre-employment psychological assessment of Mensah for the Wauwatosa Police Department hiring process. R. 77-5. |
| --- | --- |
| January 2, 2015 | Mensah hired as a Wauwatosa Police Officer. R. 47 ¶13[3] |
| July 16, 2015 | Mensah shoots and kills Antonio Gonzales. *Id.* at ¶218 |
| November 2015 | Mensah is back on patrol. Mensah was not assessed for the required psychological fitness for duty evaluation and despite not being talked to nor interviewed by anyone as part of the required internal evaluation process. *Id.* at 62, 63 and 65. |
| July 23, 2016 | Mensah shoots and kills Jay Anderson, Jr. *Id.* at 111, 112. |
| February 2, 2020 | Mensah shoots and kills Alvin Cole. R. 125 at p. 10. |

It is understood that a municipality "cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691; *Kujawski*, 183 F. 3d at 737. The Seventh Circuit has held that municipalities generally are not liable

---

[3] This reference was made prior to consolidation of the cases and may be found at the *Estate of Jay Anderson, Jr. v. Joseph Mensah,* E.D. Wis. Case No. 21-CV-1179.

under § 1983 unless the constitutional violation was caused by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with "final policymaking authority." *McCormick v. City of Chicago*, 230 F. 3d 319, 324 (7th Cir. 2000); *Calhoun v. Ramsey*, 408 F. 3d 375, 379 (7th Cir. 2005). *Monell* liability attaches when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or act may fairly be said to represent official policy, inflicts injury that the government as an entity is responsible for under section 1983." *Monell*, 436 U.S. at 690-94.

Wauwatosa had a de-facto policy of condoning objectively unreasonable excessive force because it failed to adhere to its officer-involved shooting protocols after such events occurred. The failure of Wauwatosa to enforce its after-officer-involved shooting protocols in place, either expressly or implicitly, demonstrates its liability. R. 47 at ¶216.[4]

On July 15, 2015, Defendant Mensah shot and killed Antonio Gonzales. After the shooting of Gonzales, Wauwatosa failed to properly investigate, assess, and/or discipline Mensah on his use of force. Wauwatosa also failed to ensure that Mensah had undergone a psychological fitness for duty assessment prior to being returned to patrol. Seven months after Mensah was returned to duty after shooting and killing Gonzales, he shot and killed Jay Anderson. R. 47 at ¶¶ 218-219. Wauwatosa, through Weber, was aware of these deficiencies. *Id.*, at ¶221.

---

[4] This reference was made prior to consolidation of the cases and may be found at the *Estate of Jay Anderson, Jr. v. Joseph Mensah,* E.D. Wis. Case No. 21-CV-1179.

In *Woodward*, the Seventh Circuit court reviewed the tragic suicide of a pretrial detainee. *Woodward v. Corr. Med. Servs. of Ill.*, Inc., 368 F. 3d 917, 929 (7th Cir. 2004). There this Court affirmed the district court's decision by agreeing that "the provider's actual practice, as opposed to its written policy, toward the treatment of its mentally ill inmates was so inadequate that the provider was on notice that there was a substantial risk that the decedent would be deprived of necessary care." *Id*. The Court further noted that, "there was a direct causal link between the provider's deviation from its established policy and the suicide." *Id*. The Court argued that a provider does not get, "a one free suicide pass" and that this did not doom plaintiffs' argument to prove it was a custom or practice. *Id*.

Like the post shooting, non-action by Wauwatosa, jail employees ignored the policies in place to protect suicidal inmates and were deliberately indifferent to his needs. *Id*. at 929. The court in *Woodward* held that "for all intents and purposes, ignoring a policy is the same as having no policy in place in the first place." *Id*. The district court's determination that *Monell* liability did not attach to Wauwatosa's failure to adhere to its officer involved shooting protocol suggests clearly that it lacked the proper policy.

Here, like in *Woodward*, there is a genuine question of fact in whether Mensah's prior shooting of Gonzales, and Wauwatosa's laissez-faire approach to an officer's use of deadly force, was a direct link between Wauwatosa's failure to professionally and medically assess Mensah after the shooting of Antonio Gonzales and prior to Jay Anderson's shooting, which triggered municipal liability. Had any

protocol been followed, Mensah's decision-making in future situations may have been different. For instance, it is possible that Mensah may have chosen to de-escalate situations rather than escalate them; Mensah may have reached for a less deadly, more appropriate use of force. As Weber testified, it was expected that before the department allows an officer to come back to work after an officer-involved shooting that, the department "would send him to a psychologist that we use to determine if in that person's professional opinion that he is able to return" to active street duty. R. 91-13 at 5:20-22. Mensah was not sent to a psychologist after the Gonzales shooting, which occurred months prior to Anderson's execution.

The Seventh Circuit has recognized that there is liability under *Monell* even if a lack of a policy led to the constitutional deprivation. *Glisson v. Indiana Dep't of Corr.*, 849 F. 3d 372, 379 (7th Cir. 2017)(citing *Monell*, 436 U.S. 690-91). In *Glisson*, the Seventh Circuit noted, "The central question is always whether an official policy, however expressed (and we have no reason to think that the list in *Monell* is exclusive), caused the constitutional deprivation. It does not matter if the policy was duly enacted or written down, nor does it matter if the policy counsel's aggressive intervention into a particular matter or a hands-off approach." *Glisson*, 849 F. 3d at 379. Indeed, the court noted that "in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." *Glisson*, 849 F. 3d at 381; see also *King v. Kramer*, 680 F. 3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction.").

38

There was no fitness for duty assessment of Mensah after the Antonio Gonzales shooting eleven months prior to the Jay Anderson, Jr. shooting, and no one in the Wauwatosa police department, including Weber, bothered to speak to Mensah as required as part of the internal investigation before his return to patrol. R. 91-3 at 89-90: 25-4, 121:6-17, R. 91-12. Despite the absence of two critical and required evaluations, the failure of Wauwatosa to follow its policy directly caused the tragic but highly predictable consequence of the killing of Anderson less than a year after Antonio Gonzales. The district court improperly dismissed *Monell* and, because it raises genuine issues of material fact, this Court should reverse.

## <u>CONCLUSION</u>

Based on the arguments made herein, Appellant the Estate of Jay Anderson, Jr. requests this Court **REVERSE** and **REMAND** this case for further proceedings.

Dated this 7th day of January, 2025.

**CADE LAW GROUP LLC**

By: *Electronically Signed: Annalisa Pusick*
   Nathaniel Cade, Jr., SBN 1028115
   Annalisa Pusick SBN 1116379
   Madison Bedder SBN 1121996
   P.O. Box 170887
   Milwaukee, WI 53217
   (414) 255-3802 (phone)
   (414) 255-3804 (fax)
   nate@cade-law.com
   annalisa@cade-law.com
   madison@cade-law.com

**MOTLEY LEGAL SERVICES**

Kimberley Cy. Motley SBN 1047193

P.O. Box 1433
Matthews, NC 28106
(704) 763-5413 (phone)
(704) 909-4100 (fax)
kmotley@motleylegal.com

Attorneys for Plaintiffs-Appellants

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(A)(7),<br>FRAP RULE 32(G), AND FRAP RULE 32(C)</u>

The undersigned counsel of record for Plaintiff-Appellant furnishes the following in compliance with F.R.A.P Rule 32(a)(7) and Cir. R. 32(c):

I hereby certify that this brief conforms to the type-volume rules contained in F.R.A.P. Rule 32(a)(7) for a brief produced with a proportionally spaced 12-point (or larger) type-face fond. The length of this brief is 8,805 words.

Dated this 7th day of January, 2025.

**CADE LAW GROUP LLC**

By: _Electronically Signed: Annalisa Pusick_
    Nathaniel Cade, Jr., SBN 1028115
    Annalisa Pusick SBN 1116379
    Madison Bedder SBN 1121996
    P.O. Box 170887
    Milwaukee, WI 53217
    (414) 255-3802 (phone)
    (414) 255-3804 (fax)
    nate@cade-law.com
    annalisa@cade-law.com
    madison@cade-law.com

**MOTLEY LEGAL SERVICES**

    Kimberley Cy. Motley SBN 1047193
    P.O. Box 1433
    Matthews, NC 28106
    (704) 763-5413 (phone)
    (704) 909-4100 (fax)
    kmotley@motleylegal.com

## <u>PROOF OF SERVICE</u>

Pursuant to F.R.A.P. 25(d), I e-filed a digital copy of the brief in searchable

PDF format via the ECF System and served all counsel of record with the digital

version via CM/ECF System to the following:

> Jasmyne Baynard, Esq.
> Ann Wirth, Esq.
> Joseph Wirth, Esq.
> Wirth + Baynard
> 9898 West Bluemound Road, Suite 2
> Wauwatosa, WI 53226
> P: (414) 291-7979
> F: (414) 291-7960


Dated this 7th day of January, 2025.          **CADE LAW GROUP LLC**

By: *Electronically Signed: Annalisa Pusick*
     Nathaniel Cade, Jr., SBN 1028115
     Annalisa Pusick SBN 1116379
     Madison Bedder SBN 1121996
     P.O. Box 170887
     Milwaukee, WI  53217
     (414) 255-3802 (phone)
     (414) 255-3804 (fax)
     nate@cade-law.com
     annalisa@cade-law.com
     madison@cade-law.com


**MOTLEY LEGAL SERVICES**

     Kimberley Cy. Motley SBN 1047193
     P.O. Box 1433
     Matthews, NC 28106
     (704) 763-5413 (phone)
     (704) 909-4100 (fax)
     kmotley@motleylegal.com

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the below appendix.

Dated this 7th day of January, 2025.

**CADE LAW GROUP LLC**

By: _Electronically Signed: Annalisa Pusick_
    Nathaniel Cade, Jr., SBN 1028115
    Annalisa Pusick SBN 1116379
    Madison Bedder SBN 1121996
    P.O. Box 170887
    Milwaukee, WI 53217
    (414) 255-3802 (phone)
    (414) 255-3804 (fax)
    nate@cade-law.com
    annalisa@cade-law.com
    madison@cade-law.com

**MOTLEY LEGAL SERVICES**

    Kimberley Cy. Motley SBN 1047193
    P.O. Box 1433
    Matthews, NC 28106
    (704) 763-5413 (phone)
    (704) 909-4100 (fax)
    kmotley@motleylegal.com

## <u>TABLE OF CONTEXT TO CIRCUIT RULE 30(e) REQUIRED APPENDIX</u>

District Court Decision Granting Summary Judgment from
Judge Lynn Adelman on March 14, 2024 ………………….……..…. App. A 0001-0011

District Court Decision Denying a Motion to Reconsider from
Judge Lynn Adelman on October 18, 2024 …………….…….….... App. B 0012-0014

Joseph Mensah Squad Video (via flashdrive)…………………….App. C (*via mail*)

Dated this 7th day of January, 2025.

**CADE LAW GROUP LLC**

By:   *Electronically Signed: Annalisa Pusick*
   Nathaniel Cade, Jr., SBN 1028115
   Annalisa Pusick SBN 1116379
   Madison Bedder SBN 1121996
   P.O. Box 170887
   Milwaukee, WI  53217
   (414) 255-3802 (phone)
   (414) 255-3804 (fax)
   nate@cade-law.com
   annalisa@cade-law.com
   madison@cade-law.com

**MOTLEY LEGAL SERVICES**

   Kimberley Cy. Motley SBN 1047193
   P.O. Box 1433
   Matthews, NC 28106
   (704) 763-5413 (phone)
   (704) 909-4100 (fax)
   kmotley@motleylegal.com

Attorneys for Plaintiffs-Appellants

**APPENDIX A**

District Court Decision Granting Summary Judgment from
Judge Lynn Adelman on March 14, 2024

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ESTATE OF ANTONIO GONZALES,**
      **Plaintiff,**

      **v.**                                    **Case No. 21-cv-0848**

**JOSEPH ANTHONY MENSAH, et al.,**
      **Defendant.**

---

**ESTATE OF JAY ANDERSON, JR., et al.,**
      **Plaintiff,**

      **v.**                                    **Case No. 21-cv-1179**

**JOSEPH ANTHONY MENSAH, et al.,**
      **Defendant.**

---

**ESTATE OF ALVIN COLE, et al.,**
      **Plaintiff,**

      **v.**                                    **Case No. 22-cv-0856**

**JOSEPH ANTHONY MENSAH, et al.,**
      **Defendant.**

---

## <u>DECISION AND ORDER</u>

Plaintiffs in these consolidated cases are the estates and relatives of individuals who were fatally shot by defendant Joseph Mensah, a former Wauwatosa police officer. Plaintiffs bring claims under 42 U.S.C. § 1983 against Mensah, former Wauwatosa police chief Barry Weber, the City of Wauwatosa, and the Cities and Villages Mutual Insurance Company ("CVMIC"). Before me now are several motions. These consolidated cases arise out of three separate on-duty shootings by Mensah: the July 16, 2015, shooting of

**APP A 0001**

Antonio Gonzales, the June 23, 2016, shooting of Jay Anderson, Jr., and the February 2, 2020, shooting of Alvin Cole.

## I. GONZALES

On July 16, 2015, Mensah responded to a call about an intoxicated individual, Antonio Gonzales, who had threatened his roommate. When Mensah arrived, Gonzales exited the residence holding a large, decorative sword. Mensah ordered Gonzales to drop the sword. Gonzales moved towards Mensah, and Mensah issued Gonzales a final warning to "stop or I will shoot you." Gonzales waved the sword and continued to advance. When Gonzales came within 10 feet, Mensah fired two rounds at Gonzales, who later died from his injuries. Defendants move for summary judgment as to the claims alleged by the Estate of Antonio Gonzales. Plaintiffs concede that defendants are entitled to summary judgment. ECF No. 110. I will therefore grant defendants' motion.

## II. ANDERSON

In the early morning hours of June 23, 2016, Mensah, while working the late shift as a patrol officer in uniform, entered Madison Park and observed a single vehicle in the parking lot. ECF No. 79, ¶ 17. Inside the vehicle was an individual, later identified as Jay Anderson Jr., who appeared to be asleep. *Id.*, ¶ 19. Mensah called dispatch to alert them to an occupied vehicle in the park. ECF No. 92, ¶ 4. Mensah parked his squad car in front of the vehicle and turned on his bright illumination lights which allowed him to see inside the vehicle. ECF No. 79, ¶ 18. Mensah approached the vehicle from the passenger side and knocked on the passenger side window to wake Anderson up, identified himself as police, and asked Anderson to roll the passenger side window down. *Id.*, ¶¶ 26, 28; ECF No. 92, ¶ 8. Anderson woke up and rolled down the passenger window. ECF No. 79, ¶

2

28; ECF No. 92, ¶ 8. Mensah observed a gun and other belongings on the front passenger seat. ECF No. 79, ¶ 33; ECF No. 92, ¶ 11. When Mensah saw the gun he stepped back, radioed dispatch that Anderson had a gun and requested additional assistance. ECF No. 79, ¶¶ 34–35; ECF No. 92, ¶ 18. Mensah unholstered his service weapon and told Anderson not to reach for the gun. ECF No. 79, ¶ 38; ECF No. 92, ¶ 14.

The parties dispute exactly what occurred in the seconds leading up to the shooting. Defendants contend that Anderson extended his right arm toward the front passenger seat several times and, in response, Mensah pointed his gun at Anderson and "forcefully" ordered him to not reach for the gun. ECF No. 79, ¶¶ 40, 42–43. Plaintiffs argue that there is no evidence that Anderson reached for the gun. Plaintiffs note that Anderson's cell phone was also in the front seat and that the vehicle's registration was in the glove compartment. ECF No. 92, ¶¶ 11, 13, 90. Plaintiffs also contend that Anderson struggled to keep his hands up as instructed because he was tired and intoxicated. *Id.*, ¶ 98. Defendants contend, and plaintiffs dispute, that just before the shooting, Anderson "lunged" "his whole body" towards the gun on the seat, resulting in Mensah's belief that Anderson was reaching for the firearm. ECF No. 79, ¶¶ 44–45. Mensah immediately discharged his firearm six times as he disengaged, walking backwards. *Id.*, ¶ 46; ECF No. 92, ¶ 19. Mensah then contacted dispatch to alert them that shots had been fired. ECF No. 79, ¶ 47; ECF No. 92, ¶ 21.

APP A 0003

Both parties provided the court with footage of the shooting captured by the camera in Mensah's squad car. The footage[1] begins at 03:06:55 A.M., depicting Mensah with his service weapon raised at the front passenger window of Anderson's vehicle. Anderson's hands are raised above his head. At 03:07:13 A.M., Anderson's right hand dips toward the seat and rises back up again. Two seconds later, at 03:07:15 A.M., Anderson's right hand again dips toward the seat. In response, Mensah discharges his weapon six times while backing away from the vehicle.

Approximately three minutes after the shooting, Wauwatosa Police Officers Ralph Salyers and Stephen Mills arrived on scene. ECF No. 79, ¶ 54. Both Salyers and Mills testified that they observed the gun on the passenger seat of the vehicle. *Id.*, ¶ 56. Mills retrieved the gun from the passenger seat of the vehicle, and Anderson's body was removed from the vehicle. *Id.*, ¶¶ 59–60; ECF No. 92, ¶ 32.

During the course of discovery, motion practice, and consolidation of the various claims against Mensah, defendants did not timely file answers to the amended complaints in the *Anderson* and *Cole* cases. Defendants have since moved for an extension of time to file answers and have attached their proposed answers to the motion. Rule 6(b) of the Federal Rules of Civil Procedure gives district courts discretion to grant extensions when deadlines are missed because of excusable neglect. *See* Fed. R. Civ. P. 6(b)(1)(B) ("When an act may or must be done within a specified time, the court may, for good cause,

---

[1] The footage includes no audio until 03:07:23 A.M. Wauwatosa Police Officers at the time were outfitted with a device that allowed them to remotely activate the dash camera in their squad vehicles. Upon activation, recording equipment on the squad car's dash camera recovered and preserved the 30 seconds of video recorded prior to activation and began recording audio. *See* ECF No. 79, ¶ 49; ECF No. 92, ¶ 25.

4

extend the time ... on motion made after the time has expired if the party failed to act because of excusable neglect."). The Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership* enumerated the factors a district court should consider when evaluating a claim of excusable neglect. 507 U.S. 380, 385 (1993). The Court explained that "the determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id.* Specifically, a court should consider the danger of prejudice to the nonmovant, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, and whether the movant acted in good faith. *Id.* District courts "enjoy wide latitude" in determining whether a litigant's explanation for missing a deadline amounts to excusable neglect. *Jones v. Bayler*, No. 22-1296, 2023 WL 3646069, at *2 (7th Cir. May 25, 2023), *cert. denied*, 144 S. Ct. 387 (2023); *Nartey v. Franciscan Health Hosp.*, 2 F.4th 1020, 1024 (7th Cir. 2021).

Considering these factors, I find that defendants' tardiness is excusable neglect. Defendants filed their motion for extension of time four months after the answers were due but only three days after they learned of the omission. The delay will not delay the case. Defendants acted in good faith as demonstrated by their attempt to rectify the omission as soon as it came to light. Most importantly, I find no prejudice to the nonmovant. Plaintiffs do not argue that they have suffered any prejudice. Nor is there any danger of prejudice. Plaintiffs knew that defendants disputed their factual allegations. The parties were engaged in discovery regarding such disputes at the time. I will therefore grant defendants' motion for extension of time to file answers to the amended complaints in *Anderson* and *Cole*.

5

I turn now to defendants' motion for summary judgement in *Anderson*. Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* I view the evidence in the light most favorable to the nonmoving party and must grant the motion if no reasonable juror could find for that party. *Id.* at 248, 255.

Although on summary judgment I view the facts in the light most favorable to the nonmovant, in the rare circumstances when video footage clearly contradicts the nonmovant's claims, I may consider that video footage without favoring the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)). Videos are sometimes unclear, incomplete, and may fairly be open to varying interpretations. *Id.* However, when video footage firmly settles a factual issue, there is no genuine dispute of material fact precluding summary judgment. *Id.* When "the person most likely to rebut the officers' version of events—the one killed—can't testify," to ensure fairness to a deceased plaintiff whose representative alleges an impermissible use of deadly force, given the impossibility of victim testimony to rebut the officers' account, I must "scrutinize all the evidence to determine whether the officers' story is consistent with other known facts." *King v. Hendricks City Commissioners*, 954 F. 3d 981, 985 (7th Cir. 2020). (internal citations omitted).

6

APP A 0006

Plaintiffs allege that Mensah used excessive force when he shot Anderson. A claim that police officers have used excessive force is "analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). In considering whether use of force was reasonable, I assess the totality of the facts and circumstances, including consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Strand v. Minchuk*, 910 F.3d at 914–15 (quoting *Graham*, 490 U.S. at 396).

Where an officer uses deadly force, the officer must have "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). The proper inquiry is one of "objective" reasonableness without regard to the subjective "intent or motivation" of the officer. *Strand*, 910 F.3d 909, 915–16 (citing *Graham*, 490 U.S. at 397). This inquiry is highly fact-intensive and involves "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. In determining "reasonableness" I must take into consideration the fact that police officers are often forced to make split-second judgments in tense and rapidly evolving circumstances. *Strand*, 910 F.3d at 916. The objective reasonableness of an officer's actions must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. What matters in determining whether the officer used an appropriate level of force is the amount and quality of the information known to the officer at the time he fired the weapon. *Horton*, 883 F.3d at 950.

7

APP A 0007

Based on the circumstances surrounding the shooting, I find that Mensah's response was not objectively unreasonable and thus did not violate Anderson's Fourth Amendment rights. Mensah observed a weapon in Anderson's front passenger. Prior to the shooting, Mensah radioed dispatch to inform the other officers about the gun. Officer Salyers and Officer Mills both testified that they observed the gun in the front passenger seat. The squad car footage shows Officer Mills removing the weapon from the front seat. Mensah testified that he ordered Anderson not to reach for the gun and to keep his hands up. It also shows that in the seconds leading up to the shooting, Anderson reached his right hand towards the seat where the weapon was located.

An officer who shoots a suspect when the suspect is reaching for his firearm exhibits a response that is "objectively reasonable," and thus cannot be found to have violated that suspect's Fourth Amendment rights. *Helman v. Duhaime*, 742 F.3d 760, 763 (7th Cir. 2014). Deadly force is reasonable "where an officer has reasonable cause to believe that the suspect poses a danger of serious bodily harm, such as when the officer believes the suspect has a weapon." *Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007) (citing *Garner*, 471 U.S. at 11) (holding that an officer had reasonable cause to use deadly force in a struggle for a loose gun where suspect "had his hands on or near" the weapon); *see also Conley-Eaglebear v. Miller*, No. 16-3065, 2017 WL 7116973, at *2 (7th Cir. Sept. 26, 2017) (noting that an officer need not wait for a suspect "to face him or point the gun directly at him before acting to protect himself"). Under the circumstances, Mensah's belief that Anderson posed an immediate threat to his safety was not unreasonable.

8

APP A 0008

Plaintiffs contend that there is no evidence that Anderson reached for the gun, that he could have been reaching for his cell phone, which was also located on the front passenger seat, or for the vehicle's registration in the glove compartment. But the proper inquiry is whether Mensah's actions were reasonable based on the information he knew at the time he fired his weapon. Mensah could not have known whether Anderson was reaching for the weapon or for something else. The phone was located on the seat next to the gun, and one would need to reach over the seat where the gun was located to reach the glove compartment. Plaintiffs also argue there is no evidence that the gun was loaded. But again, the reasonableness inquiry focuses on the information Mensah had at the time. Mensah could not have known whether the gun was loaded or not. Finally, plaintiffs argue there is a factual dispute as to whether Anderson even reached towards passenger seat. However, they acknowledge that Anderson lowered his arm possibly as a result of being too tired or intoxicated. The footage confirms that Anderson lowered his right hand in the direction of the passenger seat. Once again, Mensah could have reasonably believed that Anderson was reaching for his gun. Thus, defendants are entitled to summary judgment on Anderson's excessive force claim.

Defendants also move for summary judgment on the claims against police chief Weber, Mensah's superior, against the City of Wauwatosa, based on failure to train, and on Anderson's minor daughter J.A.'s claim for loss of society and companionship. I will grant these motions because these claims necessarily fail if the excessive force claim against Mensah fails. I will also grant summary judgment to defendants on the estate's equal protection claim. I will also grant summary judgment on the equal protection claim. To state an equal protection claim, plaintiffs must prove that the defendants' actions had

9

APP A 0009

a discriminatory effect and were motivated by a discriminatory intent or purpose. *Chavez v. Illinois State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001). There is no evidence in the record of any discriminatory effect or purpose.

### III. COLE

On February 2, 2020, Wauwatosa police were dispatched to Mayfair Mall to investigate an alleged disturbance. Witnesses to the disturbance identified a group of minors, including a young African American male in a light grey hoodie, later identified as Alvin Cole. An officer encountered the group whose members fled. The police pursued the group on foot, and a gun was fired. Ten seconds later, Mensah shot Cole five times. The parties dispute what occurred in the moments before the shooting. Defendants assert that Cole had a gun in his hands when Mensah shot him, but the officers offer conflicting testimony as to the position of Cole's body at the time of the shooting and as to where the gun was pointed. In their brief, plaintiffs assert that witnesses observed Cole without a gun but do not present supporting evidence. The footage of the shooting from a squad car does not clearly indicate what occurred.

Defendants move for summary judgment on all claims alleged by the Estate of Alvin Cole. I find that oral argument might be helpful on whether there are issues of material fact. Accordingly, I will hold argument on the motion on **April 9, 2024, at 11:00 A.M.** Each side will be allotted twenty (20) minutes.

### IV. CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion for summary judgment in *Gonzales* (ECF No. 69) is **GRANTED**.

10

APP A 0010

IT IS FURTHER ORDERED that defendants' amended motion for extension of time to file answers to the amended complaint in case number 21-CV-1179 and the amended complaint in case number 22-CV-0856 (ECF No. 108) is **GRANTED**.

IT IS FURTHER ORDERED that defendants' motion for summary judgment in *Anderson* (ECF No. 78) is **GRANTED**.

IT IS FURTHER ORDERED that plaintiffs' motion for oral argument (ECF No. 98) is **GRANTED IN PART**. Oral argument on defendants' motion for summary judgment in *Cole* is scheduled for **April 9, 2024, at 11:00 A.M.** in Courtroom 390, 517 E Wisconsin Ave., Milwaukee, WI 53202.

IT IS FURTHER ORDERED that plaintiffs' motions to file sur-reply briefs (ECF Nos. 119, 121) are **GRANTED**.

IT IS FURTHER ORDERED that defendants' first motion for extension of time to file answer (ECF No. 100), plaintiffs' motion to strike defendants' first motion for extension of time (ECF No. 104), and plaintiffs' motion to strike defendants' motion for protective order (ECF No. 59) are **DENIED AS MOOT**.

Dated at Milwaukee, Wisconsin, this 14th day of March, 2024.

/s/ Lynn Adelman
LYNN ADELMAN
United States District Judge

11

APP A 0011

**APPENDIX B**

District Court Decision Denying a Motion to Reconsider from
Judge Lynn Adelman on October 18, 2024

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ESTATE OF ANTONIO GONZALES,**
      **Plaintiff,**

      **v.**                               **Case No. 21-cv-0848**

**JOSEPH ANTHONY MENSAH, et al.,**
      **Defendant.**

---

**ESTATE OF JAY ANDERSON, JR., et al.,**
      **Plaintiff,**

      **v.**                               **Case No. 21-cv-1179**

**JOSEPH ANTHONY MENSAH, et al.,**
      **Defendant.**

---

**ESTATE OF ALVIN COLE, et al.,**
      **Plaintiff,**

      **v.**                               **Case No. 22-cv-0856**

**JOSEPH ANTHONY MENSAH, et al.,**
      **Defendant.**

---

## <u>ORDER</u>

Plaintiffs in these consolidated cases are the estates and relatives of individuals who were fatally shot by defendant Joseph Mensah, a former Wauwatosa police officer. On March 14, 2024, I granted defendants' motion for summary judgment on the claims alleged by the Estate of Jay Anderson, Jr., and Anderson's minor daughter, J.A. Plaintiffs move for reconsideration of that decision pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. For the reasons stated below, the motion will be denied.

**APP B 0012**

A Rule 59(e) motion to alter or amend a judgment will succeed only where the movant clearly establishes that the court committed a manifest error of law or fact or that newly discovered evidence precluded entry of judgment. *Blue v. Hartford Life & Accident Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012). "Manifest error of law" refers to the misapplication or misidentification of controlling precedent. *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000).

Plaintiffs argue that I improperly failed to draw all reasonable inferences in favor of the nonmovant because I determined that Anderson was reaching for his gun before being shot. Plaintiffs argue that Anderson could have been reaching for his gun, his phone, or something else and if he was reaching for something other than the gun, defendant's shooting of him would have been unreasonable.

The question on summary judgment was whether a reasonable factfinder could have found that Mensah had probable cause to believe that Anderson posed a significant threat of death or serious physical injury to him. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). In determining whether Mensah's actions were objectively reasonable, I considered only the circumstances known and information available to Mensah at the time. *Horton v. Pobjecky*, 883 F.3d 941, 949–50 (7th Cir. 2018); *Doornbos v. City of Chicago*, 868 F.3d 572, 579 (7th Cir. 2017) ("In deciding excessive force claims, the issue is whether an officer's use of force was objectively reasonable given the information he or she knew at the time."); *Sherrod v. Berry*, 856 F.2d 802, 804 (7th Cir. 1988) ("Knowledge of facts and circumstances gained after the fact . . . has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment."). It is undisputed that the gun was on Anderson's passenger seat, next to his cell phone.

2

APP B 0013

The video footage clearly shows that Anderson reached downward towards the passenger seat immediately before Mensah fired the fatal shots. Mensah had no way of knowing whether Anderson was reaching for the gun, his phone, or something else. Thus, viewing the facts in the light most favorable to Anderson and assuming that he intended to reach for something other than the gun, Mensah's belief that Anderson posed an immediate threat to his safety was still not unreasonable.

Further, plaintiffs incorrectly assert that I determined that Anderson was reaching for his gun. I actually decided only that defendant had probable cause to reach that conclusion. It is also worth noting that plaintiffs present no evidence that Anderson was reaching for something other than the gun.

Thus, for the reasons stated, **IT IS ORDERED** that plaintiffs' motion for reconsideration of my grant of summary judgment in the *Anderson* case (ECF No. 127) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 18th day of October, 2024.

/s/ Lynn Adelman
LYNN ADELMAN
United States District Judge

3

APP B 0014

**APPENDIX C**
Joseph Mensah Squad Video (via flashdrive only)