No. 24-3054

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

ESTATE OF JAY ANSERSON, JR., et al.

                Plaintiffs-Appellants,

v.

JOPSEH MENSAH, et al.

                Defendants-Appellees.

On Appeal From The United States District Court
For the Eastern District of Wisconsin
Case Nos.  2:21-cv-00848-LA & 2:21-cv-01179-LA
The Honorable Judge Lynn Adelman

**BRIEF OF THE
DEFENDANTS-APPELLEES, JOSEPH MENSAH, CITY OF WAUWATOSA,
and FORMER POLICE CHIEF BARRY WEBER**

**WIRTH + BAYNARD**
Jasmyne M. Baynard
Joseph W. Wirth
Attorneys for the Defendants-Appellees

9898 West Bluemound Road, Suite 2
Wauwatosa, Wisconsin 53226
(414) 291-7979

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-3054

Short Caption: Estate of Jay Anderson, J. v. Joseph Mensah, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Joseph A. Mensah, City of Wauwatosa, and former Chief of Police Barry Weber

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

WIRTH + BAYNARD

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

None

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Jasmyne M. Baynard    Date: 02/07/2025

Attorney's Printed Name: Jasmyne M. Baynard

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✔]    No [ ]

Address: 9898 W Bluemound Road, Suite 2 - Wauwatosa, WI 53226

Phone Number: (414) 291-7979    Fax Number: (414) 291-7960

E-Mail Address: jmb@wbattys.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-3054

Short Caption: Estate of Jay Anderson, J. v. Joseph Mensah, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Joseph A. Mensah, City of Wauwatosa, and former Chief of Police Barry Weber

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

WIRTH + BAYNARD

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Joseph M. Wirth    Date: 02/07/2025

Attorney's Printed Name: Joseph M. Wirth

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☑  No ☐

Address: 9898 W Bluemound Road, Suite 2 - Wauwatosa, WI 53226

Phone Number: (414) 291-7979    Fax Number: (414) 291-7960

E-Mail Address: jmw@wbattys.com

rev. 12/19 AK

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENTS

TABLE OF AUTHORITIES ................................................................ iii

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES ................................................................. 2

STATEMENT OF THE CASE ............................................................. 3

    A.   Factual Background ................................................................ 3

    B.   Procedural History ................................................................ 7

SUMMARY OF ARGUMENT ............................................................ 9

ARGUMENT ................................................................................. 11

    I.   THE DISTRICT COURT PROPERLY CONCLUDED THAT OFFICER MENSAH'S USE OF DEADLY FORCE WAS OBJECTIVELY REASONABLE. ................................................................ 12

        A.   Officer Mensah's Use of Deadly Force Was Objectively Unreasonable Under the Circumstances. ............................ 14

        B.   Plaintiffs' Factual Misrepresentations Do Not Create Reasonable Inferences that Defeat Summary Judgment. ......... 16

        C.   The District Court Did Not Err by Relying on Squad Video Recordings Which Support Mensah's Testimony. ......... 21

    II.   OFFICER MENSAH IS ENTITLED TO QUALIFIED IMMUNITY ........... 24

    III.   THE DISTRICT COURT PROPERLY DISMISSED THE MONELL CLAIM ................................................................ 27

        A.   Plaintiffs' Appeal of the Dismissal of Their *Monell* Claim is Untimely. ................................................................ 29

B.     Plaintiffs Have Not Established the Required Elements of *Monell* Liability Against the City if Wauwatosa or its Chief Of Police. ................................................................................ 31

C.     The authority cited by Plaintiffs is neither applicable nor Persuasive. ........................................................................................... 37

IV.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY GRANTING DEFENDANTS' MOTION FOR EXTENSION OF TIME TO ANSWER THE AMENDED COMPLAINT. .................................. 40

CONCLUSION ................................................................................................... 49

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(A)(7), FRAP 32(G), FRAP RULE 32(C) ............................................................................................. 50

PROOF OF SERVICE ........................................................................................ 51

# TABLE OF AUTHORITIES

**CASES**                                                                                                                  **Page(s)**

*Abdullahi v. City of Madison*,
    423 F.3d 763 (7th Cir. 2005) ........................................................................ 21

*Anderson v. Creighton*,
    483 U.S. 635 (1987) ..................................................................................... 26

*Barwin v. Vill. of Oak Park*,
    No. 14-CV-6046, 2021 WL 6882305 (N.D. Ill. Apr. 30, 2021) ................... 45

*Bd. of Cty. Comm'rs v. Brown*,
    520 U.S. 397 (1997) ..................................................................................... 28

*Bowles v. Russell*,
    551 U.S. 205 (2007) ..................................................................................... 30

*Burlington N. R. Co. v. Huddleston*,
    94 F.3d 1413 (10th Cir. 1996) ...................................................................... 46

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..................................................................................... 12

*Central National Gottesman, Inc., Cent. Nat'l Gottesman, Inc. v. J.S. Paluch Co.*,
    No. 19-CV-06997, 2021 WL 2939968 (N.D. Ill. July 12, 2021) ................ 45

*Cibulka v. City of Madison*,
    992 F.3d 633 (7th Cir. 2021) ........................................................................ 25

*Chorosevic v. MetLife Choices*,
    600 F.3d 934 (8th Cir. 2010) ........................................................................ 41

*City of Escondido, Cal. v. Emmons*,
    586 U.S. 38 (2019) ................................................................................. 25, 26

*Conley-Eaglebear v. Miller*,
    No. 1:2014cv1175 (E.D. Wis. 2016) ............................................................ 27

*Doxtator v. O'Brien*,
    39 F.4th 852 (7th Cir. 2022) ........................................................................ 13

*Edelman v. Belco Title & Escrow, LLC,*
   754 F.3d 389 (2014) ............................................................... 47, 48

*Est. of Biegert by Biegert v. Molitor,*
   968 F.3d 693 (7th Cir. 2020) ............................................... 25

*Finkel v. Romanowicz,*
   577 F.3d 79 (2d Cir. 2009) ................................................. 47

*First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago,*
   988 F.3d 978 (7th Cir. 2021) ............................................. 28, 29

*Ford v. Childers,*
   855 F.2d 1271 (7th Cir. 1988) ........................................... 13, 27

*Glisson v. Indiana Dep't of Corr.,*
   849 F.3d 372 (7th Cir. 2017) ............................................. 38, 39

*Graham v. Connor,*
   490 U.S. 386 (1989) ..................................................... 9, 12, 13, 26

*Helman v. Duhaime,*
   742 F.3d 760 (7th Cir. 2014) ............................................. 27

*Henning v. O'Leary,*
   477 F.3d 492 (7th Cir. 2007) ............................................. 23, 27

*Horton v. Pobjecky,*
   883 F.3d 941 (7th Cir. 2018) ......................................... 11, 12, 14

*Isby v. Clark,*
   100 F.3d 502 (7th Cir.1996) ............................................. 44

*Jones v. Bayler,*
   *No.* 22-1296, 2023 WL 3646069 (7th Cir. May 25, 2023),
   cert. denied, 144 S.Ct. 387 (2023) ................................... 40

*Kisela v. Hughes,*
   584 U.S. 100 (2018) ....................................................... 25, 26

*King v. Hendricks Cty. Commissioners,*
   954 F.3d 981 (7th Cir. 2020) ............................................. 16

*King v. Kramer*,
    680 F.3d 1013 (7th Cir. 2014) ............................................................. 36

*Kingsley v. Hendrickson*,
    576 U.S. 389 (2015) ............................................................................... 14

*L.A. Pub. Ins. Adjusters, Inc. v. Nelson*,
    17 F.4th 521 (5th Cir. 2021) ............................................................... 45

*Lopez v. Sheriff of Cook Cty.*,
    993 F.3d 981 (7th Cir. 2021) ............................................................... 25

*Malley v. Briggs*,
    475 U.S. 335 (1986) ............................................................................... 25

*Mannoia v. Farrow*,
    476 F.3d 453 (7th Cir. 2007) ............................................................... 26

*Mayle v. Illinois*,
    956 F.3d 966 (7th Cir. 2020) ......................................................... 43, 49

*Mitchell v. Forsyth*,
    472 U.S. 511, 526 (1985) ..................................................................... 12

*Modrowski v. Pigatto*,
    712 F.3d 1166 (7th Cir. 2013) ............................................................. 44

*Moje v. Fed. Hockey League, LLC*,
    792 F.3d 756 (7th Cir. 2015) ............................................................... 43

*Monell v. Dep't of Soc. Servs.*,
    436 U.S. 658 (1978) ............................................................................... 28

*Nartey v. Franciscan Health Hosp.*,
    2 F.4th 1020 (7th Cir. 2021) ......................................................... 40, 49

*Nestorovic v. Metro. Water Reclamation Dist. of Greater Chicago*,
    926 F.3d 427 (7th Cir. 2019) ............................................................... 49

*Parent v. Home Depot U.S.A., Inc.*,
    694 F.3d 919 (7th Cir. 2012) ............................................................... 48

*Pearson v. Callahan,*
    555 U.S. 223 (2009) .................................................................. 25

*Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership,*
    507 U.S. at 395 (1993) ........................................................ 41, 43, 45

*Riccardo v. Rausch,*
    375 F.3d 521 (7th Cir. 2004) .................................................... 25

*Sallenger v. City of Springfield, Ill.,*
    630 F.3d 499 (7th Cir. 2010) .................................................... 27

*Satkar Hosp., Inc. v. Fox Television Holdings,*
    767 F.3d 701 (7th Cir. 2014) .................................................... 30

*Scott v. Edinburg,*
    346 F.3d 752 (7th Cir. 2003) .................................................... 12

*Scott v. Harris,*
    550 U.S. 372 (2007) .................................................................. 12

*Sherrod v. Berry,*
    856 F.2d 802 (7th Cir. 1988) .................................................... 13

*Siegel v. Shell Oil Co.,*
    612 F.3d 932 (7th Cir. 2010) .................................................... 48

*Siler v. City of Kenosha,*
    957 F.3d 751 (7th Cir. 2020) .................................................... 24

*Taylor v. Hughes,*
    26 F.4th 419 (7th Cir. 2022) .................................................... 28

*Talano v. Nw. Med. Fac. Found., Inc.,*
    273 F.3d 757 (7th Cir. 2001) .................................................... 31

*Tennessee v. Garner,*
    471 U.S. 1 (1985) .............................................................. 12, 26

*Upton v. Thompson,*
    930 F.2d 1209 (7th Cir. 1991) .................................................. 25

*Woodward v. Corr. Med. Servs. of Illinois, Inc.,*
    368 F.3d 917 (7th Cir. 2004) ............................................................... 38

## RULES and STAUTES

Fed. R. App. P. 4(a)(1)(A) ................................................................................ 30

Fed. R. App. P. 4(a)(1)(A)(iv) ......................................................................... 30

Fed. R. Civ. P. 6(b) ......................................................................................... 44

Fed. R. Civ. P. 6(b)(2) ............................................................................... 40, 42

Fed. R. Civ. P. 7(b)(1) ..................................................................................... 31

Fed. R. Civ. P. 8(c)(2) ..................................................................................... 46

Fed.R.Civ.P. 12(a)(4)(A) ................................................................................. 46

Fed.R.Civ.P. 56(c) ..................................................................................... 12, 16

Fed. R. Civ. P. 56(e) ....................................................................................... 31

Fed. R. Civ. P. 58(a) ....................................................................................... 29

Fed. R. Civ. P. 58(c)(2)(B) .......................................................................... 29, 30

Fed. R. Civ. P. 59 ........................................................................................... 30

Wis. Stat. §175.47 .......................................................................................... 33

Wis. Stat. §§175.47(2)-(3) ............................................................................... 33

Wis. Stat. §175.47(3)(c) .................................................................................. 33

Wisconsin Act 348 ..................................................................................... 32, 33

# JURISDICTIONAL STATEMENT

The conduct alleged in the complaint occurred in Wauwatosa, Wisconsin, within the Eastern District of Wisconsin, and venue of plaintiffs' claims vested in the District Court for the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(b). (R. 1 in E.D. Wis. Case No. 21-CV- 1179)[1]

The District Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 because relief is sought under 42 U.S.C. § 1983 for a violation of the Fourth and Fourteenth Amendments to the United States Constitution.

On August 8, 2022, Plaintiffs-Appellants moved to consolidate three cases related to the estates and relatives of three individuals who were fatally shot and killed on three separate and unrelated occasions because they all involved the defendant and former Wauwatosa Police Officer, Joseph Mensah.[2] (R. 28) Consolidation was granted for pretrial matters only. (R. 34)

On July 24, 2023, Defendants moved for summary judgment of all claims. (R. 78) On March 14, 2024, the district court entered an order granting defendants' motion for summary judgment. (R. 125) On March 15, 2024, Plaintiffs filed an expedited motion for reconsideration of the dismissal of their excessive force claim. (R. 127) The district court denied plaintiffs' motion for reconsideration on October 18, 2024. (R. 139)

---

[1] The record citation is to the original case number for the matter on appeal, *Estate of Jay Anderson Jr. v. Joseph Mensah, et. al.*, E.D. Wis. Case No. 21-CV- 1179. However, throughout the Appellees' brief, the record citations will be to the case with which this matter was consolidated for pretrial purposes, the *Estate of Antonio Gonzalez v. Joseph Mensah, et al*, E.D. Wis. Case No. 21-CV-848, unless noted otherwise.

[2] The cases consolidated for pretrial purposes were *Estate of Antonio Gonzalez, et. al. v. Joseph Mensah, et. al.*, E.D. Wis. Case. No. 21-CV-848, and *Estate of Jay Anderson, Jr. v. Joseph Mensah, et. al.*, E.D. Wis. Case No. 21-CV-1179, and *Estate of Alvin Cole v. Joseph Mensah, et. al.*, E.D. Wis. Case No. 22-CV-856.

On November 26, 2024, the district court ordered that final judgment be entered dismissing E.D. Wisconsin Case No. 21-cv-1179, *Estate of Jay Anderson, Jr., et. al. v. Mensah, et. al.* (R 156). The district court then ordered deconsolidation of this case from the cases of *Estate of Antonio Gonzalez* and *Estate of Alvin Cole.* (*Id.*).

The order appealed from was entered by the district court, the Honorable Lynn Adelman, on March 14, 2024. (R. 125) This appeal relates only to the granting of Defendants' Motion for Summary judgment in *Estate of Jay Anderson, Jr.*, v. *Joseph Mensah, et. al,* E.D. Wisconsin Case No. 21-CV-1179.

Plaintiffs filed their Notice of Appeal on October 21, 2024, seeking review and reversal of the district court's dismissal of their excessive force claim. (R. 141) Plaintiffs amended their Notice of Appeal on November 8, 2024, to expand their requested relief to include review and reversal of all claims dismissed by the district court in this matter. (R. 147).

As it relates to the *Estate of Jay Anderson, Jr.*, no issues remain before the district court. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT ON THE ISSUES PRESENTED FOR REVIEW

1.      Whether the district court properly granted summary judgment in favor of Mensah and dismissing Anderson's Fourth Amendment claim;

3.      Whether the district court properly exercised its discretion when it dismissed Anderson's *Monell* claim; and

2.      Whether the district court properly exercised its discretion when it granted Defendants an extension to file an answer to the amended complaint.

<center>**STATEMENT OF THE CASE**</center>

**A.      Factual Background**

This case is an officer-involved shooting resulting in the death of Jay Anderson Jr. The following statement of facts are derived from the testimony of Officer Mensah, back-up officers Salyers and Mills, and video capturing the pertinent portions of the interactions between Officer Mensah and Anderson as information developed during the investigation.

On the night of June 22, 2016, and into the morning of June 23, 2016, Officer Mensah was working the late shift in full uniform as a patrol officer for the City of Wauwatosa Police Department. (R. 77-6, pp. 7, 143) One of Officer Mensah's responsibilities was to routinely patrol the City's Madison Park after hours and investigate the presence of anyone found in the park, ascertain their reasons for being in the park, eliminate the possibility of medical distress, ensure there was no illicit or illegal activity, such as drugs, sexual activity, or other violation of any city, county, or state ordinances, and to conduct welfare checks. (R. 77-6, pp. 11-12, 30, 55) In Mensah's experience encountering people in the park after hours, just his presence and approach would usually result in the individuals leaving the park. (R. 77-6, pp. 23-24, 88, 141; *see also* R. 77-11, p. 59)

On June 23, 2016, at approximately 12:30 a.m. Officer Mensah conducted his first park check and encountered an individual who he instructed to leave. (R. 77-6, pp. 12, 133) At 3:00 a.m., Officer Mensah was conducting another park check when he observed a single vehicle parked in the middle of the parking lot; at that hour, a violation of City

<center>3</center>

ordinance. (R. 77-6, pp. 12, 15) Officer Mensah parked his squad in front of and facing the vehicle and turned on his squad's bright illumination lights to allow him to see any occupant inside. He observed an individual, later determined to be Jay Andrson, who appeared to be sleeping. (R. 77-6 pp. 16-18, 29)

At 3:02 a.m., Officer Mensah radioed dispatch and advised of his location at Madison Park and of the presence of an occupied auto. (R. 77-6 p. 48; R. 76-16 at 0:00:01) Officer Mensah approached the vehicle from the passenger side to speak with Anderson and investigate why he was in the park after hours. (R. 77-6, pp. 35-36, 143) Officer Mensah knocked on the passenger side window to wake Anderson, identified himself as police, and asked Anderson to roll down the passenger side window. (R. 77-6 pp. 36-38, 102) During their brief interaction, Officer Mensah observed Anderson looking at him and then looking down at the passenger seat. Officer Mensah felt the repeated conduct was odd, and it prompted him to step back from the vehicle. (R. 77-6 pp. 39-41) When he did so, Officer Mensah was able to see a semi-automatic handgun, with its magazine inserted, on the front passenger seat. (R. 77-6, pp. 41, 112-113) In response, Officer Mensah unholstered his firearm, held it at the low ready position, and commanded Anderson not to reach for the gun. (R. 77-6, pp. 41-42, 59, 91)

At 3:06 a.m., Officer Mensah radioed for assistance, asking, "Step it up. He has a gun!" (R. 76-16 at 03:06:18; *see also* R. 77-6, pp. 46, 59, 105-106) While waiting for backup, Officer Mensah told Anderson he had seen the gun and ordered Anderson to keep his hands up and not reach for it. (R. 77-6, pp. 41-42, 59, 91) Anderson initially put his hands up, but repeatedly dropped them and reached towards the passenger seat. (R. 77-6, pp.

59-60, 112-114) Officer Mensah raised and pointed his firearm at Anderson and again ordered him not to reach for the gun. (R. 77-6, pp. 41-42) Anderson subsequently lunged toward the gun and, in fear for his life, Officer Mensah discharged his firearm at Anderson, resulting in Anderson's death. (R. 77-6, pp. 58-60, 74, 112-114, 142:19 – 143:5; *see also* R. 77-17 at 03:07:14)

Immediately after discharging his weapon, Officer Mensah radioed, "Shots fired!" and then remotely activated his squad dash camera by pressing the activation button on his vest. (R. 76-16 at 0:4:40; R. 77-6, pp. 82, 105) Officer Mensah knew that upon activation, recording equipment on the squad car's dash camera would recover and preserve 30 seconds of video recorded prior to activation, and would therefore preserve a recording of his encounter with Anderson. Officer Mensah wanted the encounter recovered because he knew it would be the only way to document what happened. (R. 77-6 pp. 83, 105, 147-148)

The squad video shows Officer Mensah standing on the passenger side with his firearm pointing at Anderson. At that time Anderson's hands appear to be up above his shoulders, which is consistent with Officer Mensah's request to him. (R. 76-17 at 03:06:55) The video then shows Anderson drop his right hand toward the passenger seat, raise it for an instant but then quickly drop it again as he leans toward the gun's location on the seat. (R. 76-17 at 03:06:55 – 03:07:7:12)



In response to Anderson's maneuver toward the gun, Officer Mensah discharged his weapon. (R. 77-6, p. 114; *see also* R. 76-17 at 03:07:14)

Wauwatosa Police Officers Ralph Salyers and Stephen Mills were the first back-up officers to respond to the scene after the shooting. (R. 76-16 at 0:05:43; *see also* R. 77-10 p. 16, R. 77-11 p. 12; and R. 80-10 at 03:08:17) They observed the loaded firearm on the front passenger seat within reach of Anderson's hand. (R. 77-10 pp. 28-29; R. 77-11 pp. 19-20) The officers removed the gun and secured it in the trunk of Officer Mills' squad. (R. 80-10 at 03:10 and 03:12:07; R. 77-10 pp. 33-34, 43-46; R. 77-11 pp. 20-21, 23, 25-28) After securing the firearm, officers removed Anderson from the vehicle and began emergency aid; thereafter, emergency medical caregivers arrived and took over lifesaving efforts, but to no avail. (R. 77-10 pp. 46, 48-50, 52-53)

### B.     Procedural History

On October 13, 2021, the Estate of Jay Anderson, Jr. ("Plaintiff") filed a 42 U.S.C. §
1983 lawsuit against the City of Wauwatosa ("City"), Police Chief Weber ("Weber") and
former Police Officer Joseph Mensah ("Mensah"). *See generally* R. 1 (21-cv-1179)[3]
Defendants timely answered the Plaintiffs' original complaint, denied all liability and
asserted affirmative defenses. *See generally* R. 14 (21-cv-1179)

Plaintiffs amended their complaint on August 24, 2022, alleging *inter alia*, that
Mensah used excessive force in violation of Anderson's Fourth Amendment right to be
free from unreasonable seizures and that the related training and supervision of the City
and Police Chief were unconstitutional and violated the equal protection clause. *See
generally* R. 47 (21-cv-1179) Defendants timely moved to dismiss the amended complaint
for failure to state a claim. (R. 50 (21-cv-1179)) The district court granted Defendants'
motion in part and dismissed the official capacity excessive force claims against Chief
Weber as duplicative of the claims against the City (R. 54 p. 4); dismissed the equal
protection claims against Chief Weber; dismissed the loss of society and companionship
claim (*Id*. p. 8); and further dismissed "Plaintiffs' assortment of claims such as a
purported deliberate inference claim under the Fourteenth Amendment, an indemnity
claim, claims under § 1983 against CVMIC and claims involving damages." *Id*.

After the district court dismissed most of the claims in the Plaintiffs' amended
complaint, four operative claims remained:

---

[3] ECF 1, 14, 47, 50, and 54 refer to filings in the *Estate of Jay Anderson, Jr., et al v. the City of Wauwatosa, et al*.,
(Eastern District of Wisconsin Case No. 21-cv-01179).

a. Fourth Amendment claim against Mensah and Weber for excessive force; (R. 47 pp. 18-22)

b. Fourteenth Amendment claim against the City and Mensah for Denial of Equal Protection; (*Id*. pp. 25-29)

c. Fourth Amendment claim against the City and Mensah for Plaintiff J.A.'s Loss of Society and Companionship (*Id.* p. 29); and

d. *Monell* liability against the City and Weber for failing to adequately train, supervise and discipline its officers. *(Id.* pp. 30-32)

On July 24, 2023, Defendants moved for summary judgment seeking dismissal of all remaining claims. (R. 81) In response to Defendants' motion for summary judgment, Plaintiffs raised for the first time an argument that Defendants had not filed an answer specifically to the amended complaint. (R. 90 pp. 9-10) Three days after learning of that omission, the Defendants filed a motion for an extension of time to file an answer, along with their proposed answer to the plaintiffs' amended complaint. (R. 100)

On March 14, 2024, the district court granted the Defendants' motion for summary judgment and entered an order disposing of all of the Plaintiffs' remaining claims. (R. 125 pp. 2-10) In that order the district court also granted Defendants' request for an extension to file an answer to the amended complaint, holding that Defendants' tardiness was excusable neglect and that the delay did not prejudice Plaintiffs. (*Id.* p. 5)

On March 15, 2024, Plaintiffs filed an expedited motion to reconsider the sole issue of the excessive force claim against Officer Mensah. *See generally* (R. 127) On October 18, 2024, the district court denied Plaintiffs' Motion for Reconsideration of the dismissal of the excessive force claim against Officer Mensah. (R. 139)

On October 21, 2024, Plaintiffs initiated an appeal of the district court's Decision and Order denying their Motion for Reconsideration. (R. 141) That appeal did not address the district court's summary judgment dismissal of Plaintiffs' other claim. *See Id*. On November 8, 2024, Plaintiffs-Appellants filed an Amended Notice of Appeal to expand their request for relief to include a review and reversal of the district court's Decision and Order granting the Defendants' Motion for Summary Judgment. (R. 147) On November 26, 2024, the court de-consolidated the cases. (R. 156), and on November 26, 2024, the court entered judgment under FRCP 58(d) memorializing the Decision and Order of March 13, 2024. (R. 157)

## SUMMARY OF THE ARGUMENT

Police officers make split-second decisions in the face of deadly situations that occur in dynamic, rapidly evolving, and dangerous conditions. Courts have consistently warned against second guessing those decisions. *Graham v. Connor*, 490 U.S. 386, 396 (1989). This case arises out of one of those split-second decisions; yet this appeal is an improper invitation to second guess.

At 3:00 a.m., on June 23, 2016, Officer Joseph Mensah, of the City of Wauwatosa (Wisconsin) Police Department, was conducting an after-hours check of the City's Madison Park. In Mensah's experience, upon encountering a vehicle impermissibly present in the park after-hours, the simple approach of his police cruiser was usually sufficient to prompt the vehicle to depart. On June 23, however, Mensah observed the vehicle occupied by Jay Anderson. When Anderson did not depart upon Mensah's arrival, Mensah exited his cruiser and approached Anderson's vehicle expecting to shoo

away a couple of amorous teenagers. Instead, Mensah was confronted by Anderson in the driver's seat with a handgun on the passenger seat next to him. Mensah radioed for back-up with the urgent request "Step it up, he has a gun."

Mensah ordered Anderson to remain still, keep his hands visible and to not reach for the handgun. Anderson ignored Mensah's commands and reached for the pistol, forcing Mensah to fire his weapon.

Anderson's decision to ignore Officer Mensah's commands and reach for a loaded handgun placed Mensah in an imminent life-or-death position. In that split-second, Mensah's reaction to avert Anderson's deadly conduct was reasonable; and Plaintiffs' efforts to create speculative arguments to the contrary are unavailing.

The district court evaluated the extensive record—including dashcam footage— and determined that under the circumstances, Officer Mensah's belief that Anderson posed an imminent, deadly threat was reasonable. The court concluded, therefore, that the force used by Mensah was not excessive and that no Fourth Amendment violation occurred.

On appeal, Plaintiffs argue that the district court erred by not sufficiently drawing factual inferences in their favor. They argue that Anderson may have been reaching for something other than the firearm that was on the passenger seat of his car. However, the district courts' favor towards a nonmovant does not require the court to accept speculation that is unsupported by the factual record. That is especially true when video evidence exists.

Moreover, the district court reasoned that even accepting the assumption that in Anderson's refusal to follow Mensah's repeated commands, he was reaching for something other than the handgun, it remained reasonable for Mensah to presume that Anderson was reaching for the gun and that doing so posed an imminent and deadly threat.

No genuine disputes of material fact merit the reversal of the summary judgment that dismissed the claims against Mensah. Even if such disputes existed, though, Mensah is entitled to qualified immunity against liability. Mensah's split-second decision when facing the furtive movements of an armed suspect—even if incorrect in hindsight— complied with federal law's Fourth Amendment analysis.

Regarding the City, Officer Mensah committed no violation of the Constitution; thus, there can be no basis for governmental liability under *Monell*. Plaintiffs' failure to seek reconsideration of the district court's dismissal of their *Monell* claim rendered their appeal of that dismissal untimely. And upon the merits, the Plaintiffs showed no basis for liability against the City of Wauwatosa on either a failure to train or a failure to adopt policy theory.

Finally, the district court was well within its discretion to expand the time for Defendants to file an answer to the Plaintiffs' Amended Complaint because any delay was the product of excusable neglect, and the extension did not prejudice the Plaintiffs.

## ARGUMENT

The Court of Appeals reviews *de novo* the district court's grant of summary judgment. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). Summary judgment is not

a disfavored remedy, but rather, "an integral part of the federal rules as a whole which are designed to secure the just, the speedy and inexpensive determination of every action." *Id*. at 327. This is especially true when—as here—the defense of qualified immunity is raised. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("Qualified immunity is "an immunity from suit rather than a mere defense to liability.")

Summary judgment is proper if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Additionally, "[w]hen video footage firmly settles a factual issue, there is no genuine dispute about it, and [courts] will not indulge stories clearly contradicted by the footage" at summary judgment. *Horton*, 883 F.3d at 944 (*citing Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

## I.   THE DISTRICT COURT PROPERLY CONCLUDED THAT OFFICER MENSAH'S USE OF DEADLY FORCE WAS OBJECTIVELY REASONABLE.

A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment, so the force must be reasonable to be constitutional. *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003); *Horton*, 883 F.3d at 949. The United States Supreme Court set out the fundamental framework for analyzing excessive force claims in *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Graham v. Connor*, 490 U.S. 386 (1989). A police officer may constitutionally use deadly force to defend himself and others. "It is clear that, when an individual threatens a police officer with a deadly weapon, the officer is permitted to use deadly force in self-defense if the use is consistent with the principles set forth in *Tennessee v. Garner*." *Scott*, 346 F.3d at 757. When an officer reasonably believes an assailant's actions

place "him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988). An officer does not violate the Fourth Amendment by firing at a suspect when the officer "reasonably believed that the suspect had committed a felony involving the threat of deadly force, was armed with a deadly weapon, and was likely to pose a danger of serious harm to others if not immediately apprehended." *Ford v. Childers*, 855 F.2d 1271, 1275 (7th Cir. 1988).

Reasonableness is not based on hindsight but rather determined considering the perspective of the officer on the scene, allowing "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97; *Scott*, 346 F.3d at 756. The test for reasonableness under the Fourth Amendment is an objective one and requires an analysis of the totality of the circumstances assessed "from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight." *Graham*, 490 U.S. at 396.

**The "reasonable officer" perspective is critical,** and the Seventh Circuit recently reiterated its importance in *Doxtator v. O'Brien*, explaining:

> In evaluating whether an officer used excessive force, we are wary of hindsight bias and acknowledge the real challenges that officers regularly face on the job. These challenges often turn dangerous, calling for split-second judgments to safeguard both the public and the responding officers in "tense, uncertain, and rapidly evolving" circumstances. We remain mindful that the opportunity to debate the merits of various law enforcement responses in the peace of a judge's chambers is a privilege unavailable to most officers in real time.

39 F.4th 852, 861 (7th Cir. 2022) (internal citations and quotation omitted). What matters in determining whether the officer used an appropriate level of force is the amount and quality of the information known to the officer at the time he fired the weapon. *Horton*, 883 F.3d at 950.

Here, the district court properly evaluated the circumstances facing Mensah and applied the appropriate standard to conclude that "Officer Mensah's response was not objectively unreasonable and thus did not violate Anderson's Fourth Amendment rights." (APP A 0008).

### A. Officer Mensah's Use of Deadly Force Was Objectively Reasonable Under the Circumstances.

Plaintiffs do not dispute that Officer Mensah was permitted to use deadly force if he believed Anderson's actions placed Mensah in imminent danger of death or serious bodily injury. It is the Plaintiffs' burden to produce evidence that Mensah's belief that Anderson posed a deadly threat was **objectively unreasonable** under the totality of the circumstances. *Kingsley v. Hendrickson*, 576 U.S. 389, 391–92 (2015) (emphasis added). Plaintiffs devote little argument to their largest hurdle.

On June 23, 2016, at 3:00 a.m., Officer Mensah was on routine patrol and conducting an after-hours check at Wauwatosa's Madison Park. The park hours closed at 10:00 p.m. Officer Mensah's patrol duties included investigating the presence of anyone found in the park after hours, ascertaining their reasons, eliminating the possibility of medical distress, and ensuring there was no illicit or illegal activity. (R. 77-6 pp. 9-12, 15,

23-25, 30, 55, 141; *see also* R. 77-1 p. 57). Anderson's presence in the park at 3:00 a.m. was unlawful. (R. 77-6 pp. 23-25, 55).

At 3:02 a.m., Mensah radioed dispatch and informed them that he was in Madison Park, had discovered an occupied automobile, and provided the license plate number. (R. 76-16 at 0:00:01, 0:00:05, 0:00:55, and 0:01:24) Mensah parked his squad in front of, and facing, the unlawful vehicle and turned on his lights to allow him to see any movement within the vehicle. Officer Mensah approached the vehicle and knocked on the window to speak with its occupant and investigate Anderson's purpose for being in the park after hours. (R. 77-6 pp. 16, 29, 35-36, 143).

A brief interaction occurred between Anderson and Mensah during which Mensah observed Anderson looking at him and then looking down at the passenger seat. The interaction made Mensah uncomfortable—so he took a step back and observed on the passenger seat a semi-automatic handgun with its magazine inserted. (R. 77-6 pp. 41, 112-113). Officer Mensah unholstered his firearm, held it at the low ready position, commanded Anderson to not reach for the gun, and radioed dispatch for help—imploring "Step it up. He has a gun!" (R. 77-6 pp. 46, 59, 79-80, 105-106; R. 76-16 at 03:06:18). Anderson ignored Officer Mensah's commands and reached towards the handgun. In response, Officer Mensah discharged his firearm.

Officer Mensah's split-second decision to fire his weapon in defense against Anderson's deadly conduct was the product of the following circumstances: (1) a suspicious vehicle at 3:00 a.m., loitering after hours in a dark parking lot; (2) a loaded semi-automatic handgun within the driver's reach; (3) an individual who ignored

15

repeated instructions to stop dropping his hands toward that gun; and (4) the individual's final, sudden, quick effort to grab that gun. Under those circumstances an objectively reasonable officer would have believed that he was in imminent danger—forcing the decision to shoot or be shot.

### B. Plaintiffs' Factual Misrepresentations Do Not Create Reasonable Inferences that Defeat Summary Judgment.

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only when there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). Courts do not draw inferences that are supported by only speculation or conjecture. *King v. Hendricks Cty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020). Moreover, in cases such as this, where video footage clearly contradicts the nonmovant's arguments, the court may disregard such arguments in favor of what is shown in that video footage. As noted by the district court, when video footage firmly settles a factual issue, there is no genuine dispute of material fact that precludes summary judgment. (App A 0006).

> When the person best positioned to rebut an officer's version of events—the decedent—can't testify, to ensure fairness to a deceased plaintiff whose representative alleges an impermissible use of deadly force, given the impossibility of victim testimony to rebut the officers' account, I must scrutinize all the evidence to determine whether the officers' story is consistent with other known facts.

*Id*. (internal citations and quotations omitted). The district court, therefore, properly focused on the elements of the record that were supported by evidence rather than unsupported argument.

Plaintiffs' appellate brief contains multiple statements of pure speculation unsupported by evidence, often misrepresents the factual record, and does not create plausible disputes of fact sufficient to defeat summary judgment.

For example, Plaintiffs speculate that the presence of items on Anderson's passenger seat other than the handgun produces an inference that he may have been reaching for something other than the gun. Citing Mensah's deposition, Plaintiffs argue, "[the other officers] did not remove Anderson's other belongings, such as Anderson's cellphone or monies from the passenger seat." (App. Br. at 12-13 *citing* R. 92 ¶ 11). But Mensah's deposition testimony makes no mention of reaching for benign items on the car seat:

> Q:  Okay. At what point did you observe a weapon?
>
> A:  So when I was close to the car, I could see he was looking at me but kept looking down. And he kept looking at me and then looking down, so I was wondering what that was about, so when I looked a little closer, I saw the weapon that was in the front passenger seat. At that point, I drew my gun, told him that I see the weapon and not to reach for it. It's just a natural, I guess, flinch reaction, I backed up when I saw it. That's where that distance came from.
>
> Q:  Okay. And that's when you unholstered your weapon and brought it up?
>
> A:  At first I unholstered it. I didn't have it pointed yet. I just had it in the holster, and said, "Hey, I see the gun. Don't reach for it." And he said, "What gun?" Something to the effect of there is no gun or what gun or something like that.

(Mensah Dep. 2/28/23 at 41:11-42:5; R. 77-6 at 41:11-42:5).

The cited questions and answers do not in any way establish that Officer Mensah knew there were other objects within Anderson's reach, nor do they raise an inference that Mensah suspected Anderson to be reaching for anything other than the gun.

Plaintiffs also invoke Wisconsin's "open carry" law to argue that deadly force was unreasonable because Anderson "lawfully had a gun on his passenger seat." (App. Br. at 26). The undisputed facts demonstrate that Anderson's possession of the gun was neither "open" nor "lawful":

> The semi-automatic firearm recovered from the vehicle driven by Anderson **was examined and found to be loaded with sixteen rounds, including one in the chamber.** Anderson's DNA was also detected on the handgun. In addition, a toxicology report ordered during the autopsy of Anderson revealed the presence of marijuana in his system, and blood alcohol level of .114. In Wisconsin, a person may not lawfully operate a motor vehicle or handle a firearm with a blood alcohol level of .08 or above. **Anderson did not have a concealed carry permit, and he was not allowed to possess a firearm because of his intoxication**. Under Wisconsin law, a gun located within the passenger area of a vehicle is considered concealed. Anderson was found in possession of 12.41 grams of marijuana.

(R. 76-20 p. 3-4; R. 91-9, pp 60, 170). Notwithstanding Plaintiffs' spurious "open carry" argument, the gun's immediate presence, together with Anderson's refusal to obey commands to stop dropping his hands toward it, and his ultimate effort to reach towards the seat on which the gun was located, rendered Officer Mensah's perception of the danger posed by the circumstances objectively reasonable.

Plaintiffs' principal argument opposing the summary dismissal of their case accuses the district court of ignoring facts they assert raise questions about whether Anderson reached for the handgun. (App. Br. at 18-20). That argument misrepresents the court's analysis:

> [P]laintiffs incorrectly assert that I determined that Anderson was reaching for his gun. I actually decided only that defendant had probable cause to reach that conclusion. It is also worth noting that plaintiffs present no evidence that Anderson was reaching for something other than the gun.

(App B 0014). Plaintiffs argue that it was "shocking" that Mensah's deposition testimony was not interpreted as an admission that he knew Anderson's reach towards the gun was for some other purpose. (App. Br. at 17). Portraying the possibility that other things may have been on the passenger seat as an admission by Mensah that he believed Anderson was reaching for something other than the gun flatly misrepresents Mensah's testimony.

Officer Mensah consistently testified that he observed a gun on Anderson's seat and ordered him not to reach for it. Indeed, Mensah's June 24, 2016, statement to an investigating detective, relied upon by Plaintiffs in their argument, shows:

> PO Mensah stated he had been standing about an arm-length away from the passenger front door as he addressed the driver. He observed the driver make several glances over to the passenger front seat then back up at him. […] PO Mensah became concerned that the driver had made several separate and distinct glances towards the passenger front seat. He stepped forward and looked into the interior of the vehicle. PO Mensah observed a black and silver semiautomatic handgun on the front seat […] He did not remember seeing anything else on the seat or in which direction the barrel was facing.

(R. 91-9, p. 78). Almost 8 years after that statement, Mensah was deposed in this case and he reiterated that he believed Anderson was in possession of a gun and was reaching for that gun—not anything else on the passenger seat:

> Q:  At the time of the incident with Mr. Anderson, did you believe he was reaching for a gun?
>
> A:  Yes.
>
> Q:  Did you think he was reaching for his cell phone?

A:     No.

Q:     Did you think he was reaching for money on the seat?

A:     No.

(R. 77-6 pp. 142:19-143:5)

Q:     You knew the weapon was on the passenger seat and that he was reaching?

A:     Correct.

Q:      [Y]ou pulled your weapon because you observed the gun, correct?

A:     Correct.

(*Id*. pp. 74, 91:7-10)

Q:     [Y]ou saw Mr. Anderson reach in the direction of the gun that was on the seat, correct?

A:     Correct.

(*Id*. p. 95:12-15) Officer Mensah responded "no" when asked if he recalled seeing anything on the seat other than the gun. (R. 77-6 pp. 94:9-11). Plaintiffs' counsel then showed Mensah a photograph of the passenger seat that had been taken by investigating officers **after** they had removed and secured the gun, and he asked Mensah if it was "fair" to say, 8 years after the incident, that Mensah could not definitively rule out that Anderson had been reaching for a cell phone depicted in the photograph.

Read in context, the testimony upon which the Plaintiffs base their entire "dispute" was a question about what may have been in Anderson's mind on June 23, 2016, not on what Officer Mensah reasonably concluded Anderson was attempting when he reached

towards the handgun on his front passenger seat. It is undisputed that Anderson had a gun within his reach; that Mensah, upon seeing the gun, called out over the radio identifying the gun (R. 76-16; see also R. 77-6 p. 59); that Mensah's squad audio records him telling back-up officers that "the firearm is right next to him on the passenger seat" (R. 91-9 p. 107); and that, in fact, the backup officers located the gun on Anderson's front passenger seat, (R. 77-10 pp. 28-29, 35-36; R. 77-11 pp.19-20).

## C. The District Court Did Not Err by Relying on Squad Video Recordings Which Support Mensah's Testimony.

Plaintiffs argue that the district court "improperly award[ed] credit to Mensah" when Anderson's death should instead prevent dismissal by summary judgment. (App. Br. at 18-19). Plaintiffs cite *Abdullahi v. City of Madison* for the proposition that "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." 423 F.3d 763, 773 (7th Cir. 2005). Plaintiffs' focus on the conclusion of the sentence, that summary judgment should be granted sparingly in excessive force cases, disregards the premise on which it was based. Summary judgment is inappropriate in excessive force cases when the evidence presents competing accounts of the incident. *Id*. Here, to the contrary, video evidence is available to eliminate disputes of fact. As noted by the district court:

> Both parties provided the court with footage of the shooting captured by the camera in Mensah's squad car. The footage begins at 03:06:55 A.M., depicting Mensah with his service weapon raised at the front passenger window of Anderson's vehicle. Anderson's hands are raised above his head. At 03:07:13 A.M., Anderson's right hand dips toward the seat and rises back up again. Two seconds later, at 03:07:15 A.M., Anderson's right hand again dips toward the seat. In response, Mensah discharges his weapon six times while backing away from the vehicle.

Approximately three minutes after the shooting, Wauwatosa Police Officers Ralph Salyers and Stephen Mills arrived on scene. Both Salyers and Mills testified that they observed the gun on the passenger seat of the vehicle. Mills retrieved the gun from the passenger seat of the vehicle, and Anderson's body was removed from the vehicle.

(APP A 0004). Without any supporting legal authority, Plaintiffs argue that the district court was prohibited from making factual determinations from Mensah's squad video. (App Br. at 19). Plaintiffs do not dispute that the video plainly depicts Anderson reaching towards his passenger seat twice in 20 seconds, but instead speculate that Anderson's action might have been a reach for his car registration, a cell phone, or nothing but his "struggling to keep his hands raised for several minutes." (*Id.* at 20).

Plaintiffs invite speculation and hindsight, which proves treacherous for them. In hindsight, other evidence in the record showed that Anderson had no driver's license and that the owner of the vehicle had not given Anderson permission to drive it. (R. 91-9 p. 73). Hindsight shows that Anderson's BAC was twice the legal limit, that he was under the influence of THC, was in possession of 12.41 grams of marijuana, had $837 in small bills, and that the loaded handgun on his passenger seat was stolen. (*See* R. 91-9, pp. 60, 170). Accepting the speculation invitation, Plaintiffs ignore that it was likely, with what Anderson knew about his circumstances in that park, that he realized it was just him and Officer Mensah in a dimly lit parking lot, prompting Anderson to try to take advantage and shoot Mensah to evade arrest.

Speculation aside, the record makes clear that Officer Mensah steadfastly believed that Anderson was reaching for the gun. The summary judgment inquiry in a Fourth

Amendment analysis is objective—neither Anderson's nor Mensah's subjective positions carry the day – and instead, the undisputed evidence in this case demonstrates an objectively reasonable basis for both Mensah's belief and his reaction to Anderson's conduct. Mensah faced an occupied vehicle at 3:00 a.m., in a closed park, with a noncompliant driver, and a loaded gun on the passenger seat. Despite Officer Mensah unholstering his firearm and immediately backing up from the car's window, issuing repeated commands to remain still and not reach for the gun, radioing backup to "step it up, he has a gun," and Anderson repeatedly dropping his hand towards the seat on which the gun rested, Mensah did not fire until Anderson made an ultimate lunge for the handgun. Mensah's diligence in turning on his squad dashcam captured the incident on video, eliminating questions of fact.

Plaintiffs appear to argue that a person cannot pose a deadly threat to an officer unless he has a firearm in hand. (*See* App. Br. at 22). But that is not the law in any federal circuit. Officer Mensah was not constitutionally required to wait until Anderson got his hand on the gun, or wait for him to shoot first, before permissibly using deadly force to protect himself. *See Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007). "Police officers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon and completely freed himself from officers trying to subdue him before taking action to ensure their safety." *Id.*

Plaintiffs do not genuinely dispute the dangerousness of the situation that Mensah faced in that park on June 23, 2026. Instead, they offer comfortable armchair

quarterbacking on how reasonable officers should have reacted. The Seventh Circuit rejects such an approach. In *Siler v. City of Kenosha,* the court explained:

> law enforcement officers on the scene do not have the luxury of knowing the facts as they are known to us, with all the benefit of hindsight, discovery, and careful analysis. Officers must act reasonably based on the information they have. We must always keep in mind that encounters in the field require officers to make split-second decisions of enormous consequence.

957 F.3d 751, 759 (7th Cir. 2020).

The district court properly, thoughtfully, and with the aid of a video recording of the incident, concluded that a reasonable officer would be objectively reasonable in concluding he faced an imminent and deadly situation during the dark morning hours, in a closed park, with a noncompliant suspect who repeatedly dropped his hand towards a loaded handgun on the passenger seat next to him, directly disobeying police commands to remain still and to keep his hands visible. When Anderson, for a final time, dropped his hand and reached for the handgun, it became objectively reasonable for Mensah to discharge his weapon to protect himself. Summary judgment dismissal of the excessive force claims against Mensah was appropriate and that decision must be upheld on appeal.

## II.     OFFICER MENSAH IS ENTITLED TO QUALIFIED IMMUNITY.

Officer Mensah's use of deadly force to stop the threat posed by Anderson reaching for a firearm was objectively reasonable and thus justified under Fourth Amendment precedent. But even if there were a question as to the reasonableness of Officer Mensah's perception, he is entitled to qualified immunity and dismissal of the

claims against him. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity protects an officer officer's conduct unless it has "been authoritatively decided that certain conduct is forbidden." *Upton v. Thompson*, 930 F.2d 1209, 1212 (7th Cir. 1991).

Qualified immunity is a question of law for the court; it is not a jury question. *Riccardo v. Rausch*, 375 F.3d 521, 526 (7th Cir. 2004). In evaluating a law enforcement officer's entitlement to qualified immunity, courts undertake the twofold inquiry of asking whether the conduct violated a constitutional right and, if so, whether that right was clearly established at the time of the alleged violation. *Lopez v. Sheriff of Cook Cty.*, 993 F.3d 981, 987 (7th Cir. 2021). The court may choose which prong to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). However, failure to demonstrate a constitutional violation is dispositive of the qualified immunity inquiry. *Est. of Biegert by Biegert v. Molitor*, 968 F.3d 693, 701 (7th Cir. 2020).

A law is clearly established on an excessive force claim if: (1) there is a "closely analogous case" holding that the specific type of force used by the defendant is excessive; or (2) "a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question." *Cibulka v. City of Madison*, 992 F.3d 633, 639–40 (7th Cir. 2021). The Supreme Court has explained that the clearly established right must be defined with specificity, a principle which is "particularly important in excessive force cases." *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019) (*citing Kisela v. Hughes*, 584 U.S. 100, 103-104 (2018)). In *Kisela*, the Supreme Court instructed:

> Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply

to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.

It does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.

*City of Escondido, Cal.*, 586 U.S. at 42-43 (*quoting Kisela*, 584 U.S. 100, 104-105).

In excessive force claims, qualified immunity should be granted if a reasonable officer, facing the same situation, could have believed that deadly force was necessary to protect himself or others from death or serious physical harm. *Graham*, 490 U.S. at 396; *Tennessee*, 471 U.S. at 11. Furthermore, a government official should prevail on qualified immunity grounds if the right asserted by the plaintiff was not clearly established in the particularized sense such that "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Even where the rights allegedly violated may be clear at some level of abstraction, the government official should prevail if a reasonable officer could have believed that his or her particular conduct was lawful. *Id.* at 641.

Although the privilege of qualified immunity is a defense, the plaintiff carries the burden of defeating it. *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007). Plaintiffs here cannot carry their burden because no clearly established law rendered unreasonable Officer Mensah's use of deadly force to stop the imminent threat posed by Anderson

when he reached for the handgun. *Helman v. Duhaime*, 742 F.3d 760, 763 (7th Cir. 2014) (summary judgment properly dismisses a claim that an officer violated the Fourth Amendment by shooting a suspect who reached for his firearm because the officer's reaction is objectively reasonable); *see Ford*, 855 F.2d at 1275 (under the objective reasonableness standard, if it appears that an individual poses a serious threat of death or significant bodily harm, deadly force may be used if any misinterpretation of what appeared to be the case was reasonable under the particular facts and circumstances); *Henning*, 477 F.3d at 495 ("Deadly force…is reasonable where an officer has probable cause to believe the suspect poses a danger of serious bodily harm, such as when the officer believes the suspect has a weapon or has committed a violent crime."); *Conley-Eaglebear v. Miller*, (No. 1:2014cv1175 (E.D. Wis. 2016) (officer shooting suspect in back as he was beginning to turn toward officer with a gun in his hand was justified because suspect posed a serious threat of physical harm in making that movement).

There is no Supreme Court case law nor any decision in this circuit with sufficiently similar facts as to be closely analogous to the case at hand, that militates against qualified immunity for Officer Mensah. Thus, Mensah could not have violated any clearly established constitutional right in the June 23, 2016, shooting of Anderson, and Mensah is entitled to qualified immunity.

## III.   THE DISTRICT COURT PROPERLY DISMISSED THE MONELL CLAIM

The district court properly dismissed the claims against the City of Wauwatosa and Police Chief Weber after finding the underlying constitutional claim against Officer Mensah required dismissal. (APP A 0009); *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499,

504 (7th Cir. 2010) ("If there is no underlying constitutional violation, a municipality cannot be found liable and there is no need to determine whether there was an official policy.") Plaintiffs cannot demonstrate that Officer Mensah's actions amounted to a constitutional deprivation, and they cannot show municipal fault or moving-force causation—two indispensable prerequisites to *Monell* liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

Municipal liability under *Monell* does not incorporate the common-law doctrine of *respondeat superior*, and a municipality cannot be held liable for the constitutional torts of its employees and agents. *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). Instead, to prevail on a § 1983 claim under *Monell*, a plaintiff must challenge conduct that is properly attributable to the municipality itself. *Id.* (*citing Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997)). The Seventh Circuit has cautioned that *Monell* liability is "difficult to establish," requiring plaintiffs to "prove that a municipality, either through an express policy or an implied policy of inaction, took 'deliberate' action that was the 'moving force' behind a constitutional injury." *Taylor v. Hughes*, 26 F.4th 419, 435 (7th Cir. 2022). In a case like this one, where the plaintiffs have alleged that the municipality's action or inaction caused its employees to violate Andersons' rights, a "rigorous standard of culpability applies to ensure that the municipality is not held liable solely for the actions of its employee." *LaPorta*, 988 F.3d at 986-87.

To satisfy the standard, the plaintiff must show a "direct causal link" between the challenged municipal action and the violation of his constitutional rights. *Brown*, 520 U.S.

at 404. These requirements—policy or custom, municipal fault, and "moving force" causation—must be scrupulously applied in every case alleging municipal liability. *LaPorta*, 988 F.3d at 987.

### A. Plaintiffs' Appeal of the Dismissal of Their *Monell* Claim is Untimely.

On March 14, 2024, the district court granted summary judgment dismissal of all of Plaintiffs' claims. (ECF 125 at 2-10). On March 15, 2024, Plaintiffs filed an expedited motion to reconsider - the sole relief sought was a reversal of the dismissal of their excessive force claim against Officer Mensah. *See generally* (ECF 127). On October 18, 2024, the district court entered its Decision and Order denying Plaintiffs' Motion for Reconsideration. (ECF 139). On October 21, 2024, Plaintiffs initiated an appeal of the district court's Decision and Order denying their Motion for Reconsideration. (ECF 141). Plaintiffs' appeal did not address the lower court's summary judgment dismissal of any of Plaintiffs' claims against the City of Wauwatosa or its Police Chief. *See id*. On November 8, 2024, Plaintiffs filed an amended notice of appeal to expand their request for relief to include review and reversal of the district court's full summary judgment. (ECF 147).

Fed. R. Civ. P. 58(a) requires that the district court's summary judgment be set out in a separate document and, if no separate judgment is filed, the summary judgment is deemed entered after 150 days. F.R.C.P. 58(c)(2)(B). In this case, with the exception of the Plaintiffs' challenge to the excessive force claim against Mensah that was the subject of their motion for reconsideration, the district court's dismissal of the *Monell* claims was

deemed entered 150 days after the court's March 14, 2024, order.[4] By operation of federal rule, the court's summary judgment dismissal of the *Monell* claims was entered on August 11, 2024. (ECF 125); F.R.C.P. 58(c)(2)(B).

Pursuant to Fed. R. App. P. 4(a)(1)(A), a civil appeal must be filed within 30 days after the entry of a judgment. With entry of judgment dismissing their *Monell* claims on August 11, 2024, Plaintiffs' deadline to appeal that judgment was established as September 10, 2024. Fed. R. App. P. 4(a)(1)(A). Plaintiffs did not file *any* notice of appeal of the district court's summary judgment orders until October 21, 2024 – 41 days after the expiration of their *Monell* deadline – and did not amend their appeal to add a challenge to the *Monell* claims until November 8, 2024 - 59 days after their deadline passed. (ECF 147).

The 30-day appellate time limit is both mandatory and jurisdictional. *Satkar Hosp., Inc. v. Fox Television Holdings*, 767 F.3d 701, 706 (7th Cir. 2014). Failure to file a notice of appeal within that time limit must result in dismissal for lack of jurisdiction. *See Bowles v. Russell*, 551 U.S. 205, 213 (2007).

Plaintiffs' motion for reconsideration did not toll the appeal deadline as to the *Monell* claims. Although Fed. R. App. P. 4(a)(4)(A)(iv) provides that when a party files a motion to alter or amend a judgment under Fed. R. Civ. P. 59, the time to file an appeal does not begin running until entry of the order disposing of that motion, the Plaintiffs did not file a Rule 59 motion. (ECF 127). Plaintiffs instead moved the district court for

---

[4]   On November 26, 2024, the courted also entered a separate judgment document under FRCP 58(d) memorializing the Decision and Order of March 13, 2024. (ECF 157).

reconsideration under the Eastern District of Wisconsin's Civil L. R. 7(h) and Fed. R. Civ. P. 56(e). (ECF 127, p. 1). Their motion did not invoke the tolling provision of Rule 59.

Even if the Plaintiffs' motion had been filed under Rule 59, it still did not toll the thirty-day period because it did not satisfy Fed. R. Civ. P. 7(b)(1). *Talano v. Nw. Med. Fac. Found., Inc.*, 273 F.3d 757, 760–61 (7th Cir. 2001). Fed. R. Civ. P. 7(b)(1) requires that a motion to the court "state with particularity the grounds therefor, and shall set forth the relief or order sought." Plaintiffs' motion for reconsideration argued only that the district court erred in its analysis of whether Anderson was reaching for the handgun. (*See, supra*). The *Monell* aspects of the court's dismissal were not addressed.

Because the Plaintiffs' motion for reconsideration failed to reasonably specify any grounds for reconsideration or reversal of the order dismissing the *Monell* claims, it failed to satisfy the particularity requirement of Fed. R. Civ. P. 7(b)(1), and thus did not toll the thirty-day period to appeal the dismissal of the *Monell* claims.

### B. Plaintiffs Have Not Established the Required Elements of *Monell* Liability Against the City if Wauwatosa or its Chief Of Police.

Plaintiffs seek to impose *Monell* liability upon their argument that the Wauwatosa Police Department lacked clear policies and protocols on how to handle officers who returned to duty after being involved in a critical incident. (App. Br. at 34-35). As an alternative theory, Plaintiffs argue that Wauwatosa had a "de-facto policy of condoning objectively unreasonable excessive force by failing to adhere to its officer-involved shooting protocols after such shootings occurred." (*Id.* at 36). Both of those arguments are factually unsupported.

Plaintiffs argue that WPD failed to ensure that its officers are fit to return to patrol after critical incidents but cite Officer Mensah as the only example of such failure. Plaintiffs argue but offer no evidence that Mensah exhibited "clear warning signs" or that Wauwatosa ignored mental health issues in Mensah. Plaintiffs rely solely on broad characterizations of Mensah's involvement in two unrelated shooting incidents.

The same counsel who argue in this case that Wauwatosa failed to protect the community from Officer Mensah, must necessarily concede that his shooting of Antonio Gonzalez—who attacked both his roommate and Officer Mensah with a samurai sword – was justified. (APP A 0002). Counsel represented the Gonzales plaintiffs in that separate action, which was consolidated with this case but ultimately dismissed upon its merits, with no appeal taken.

Following the shooting of Anderson in this case, there was an exhaustive inquiry by multiple investigative agencies, who all determined that Mensah acted reasonably under the circumstances as described, *supra*. And although completely irrelevant to the court's evaluation in this case, Officer Mensah's involvement in the February 2020 shooting of Alvin Cole, another case consolidated with this matter, occurred *after* the incident at issue in this case and, by definition, could not represent a failure by Wauwatosa to observe "clear warning signs" prior to Mensah's encounter with Anderson.

Plaintiffs' assertion that the Wauwatosa Police Department lacked policies and protocols on investigating officer-involved shootings is baseless. Wisconsin Act 348 mandates the process for reviewing all law enforcement related deaths and created Wis.

Stat. §175.47. That statute requires two things—that each law enforcement agency have a written policy regarding the investigation of officer-involved deaths; and that the investigations must be conducted by outside agencies. Wis. Stat. §§ 175.47(2)-(3). Although not required, the statute permits a law enforcement agency to conduct an internal investigation into the officer-involved death if the internal investigation does not interfere with the primary investigation. Wis. Stat. § 175.47(3)(c).

In accordance with Wisconsin Act 348, the Wauwatosa Police Department created Policy 14-07, titled Investigations of Law Enforcement Involved Fatalities. (R. 76-3). This policy was in effect at the time of the Gonzales shooting.

With regards to the post-shooting investigative protocol, WPD's policy provided that all officers involved in a shooting incident are to be immediately removed from patrol, placed on administrative leave, and remain on administrative leave until several actions occur—a counseling evaluation session with an approved specialist; a criminal investigation conducted by an outside law enforcement agency; and an evaluation and criminal charging decision by the District Attorney. (R. 76-3).

Plaintiffs ignore the record and provide a chart on page 35 of their moving brief which intentionally omits events relevant to the timeline. The undisputed factual record in the consolidated cases actually demonstrates the following:

| December 1, 2014 | As part of Wauwatosa's hiring process Officer Mensah undergoes a preemployment psychological screening. (R. 71 ¶ 65-66). |
|---|---|
| July 16, 2015 | **Antonio Gonzales shooting** |
| July 27, 2015 | Officer Mensah attends session with Licensed Professional Counselor. (R. 71 ¶¶ 60-61). |
| August 3, 2015 | Officer Mensah attends session with Licensed Professional Counselor. (R. 71 ¶¶ 60-61). |

| | |
|---|---|
| **August 18, 2015** | Officer Mensah attends session with Licensed Professional Counselor. (R. 71 ¶¶ 60-61). |
| **August 24, 2015** | Officer Mensah attends session with Licensed Professional Counselor. (R. 71 ¶¶ 60-61). |
| **October 1, 2015** | The Milwaukee County District Attorney concluded his investigation and found that the actions of Officer Mensah were privileged under the law of self-defense and defense of others because he reasonably believed that he was confronting an armed suspect who intended to cause him great bodily harm or death. (R. 71 ¶¶ 53-54). |
| **October 6, 2015** | Officer Mensah and Officer Newman both underwent an after-action training with WPD Officer Bronner and WPD Lieutenant Zalewski. (R. 76-9). |
| **October 6, 2015** | Officer Mensah returned to full duty on patrol. (R. 76-9). |
| | Wauwatosa Police Department conducts administrative review. (R. 71 ¶¶ 57-58). |
| **June 23, 2016** | **Jay Anderson shooting** |
| **June 30, 2016** | Officer Mensah attends session with Licensed Professional Counselor. (R. 76-22). |
| **July 6, 2016** | Officer Mensah attends session with Licensed Professional Counselor. (*Id.*) |
| **August 3, 2016** | Officer Mensah attends session with Licensed Professional Counselor. (*Id.*) |
| **August 24, 2016** | Officer Mensah attends session with Licensed Professional Counselor. (*Id.*) |
| **September 13, 2016** | Officer Mensah attends session with Licensed Professional Counselor. (*Id*.) |
| **December 5, 2016** | The Milwaukee County District Attorney concluded his investigation and found that the conduct of Officer Joseph Mensah on June 23, 2016, was privileged in self-defense and justified under Wisconsin law. (R. 76-20). |
| **December 7, 2016** | Psychologist Rick Bauman evaluates Officer Joseph Mensah and concludes Mensah is a person of strong psychological health and can return to duty without restrictions. |
| **December 12, 2016** | Officer Mensah returned to full duty on patrol. |
| | Wauwatosa Police Department conducts administrative review. (R. 77-9). |
| **February 16, 2017** | The U.S. Department of Justice (DOJ) investigate and determine Officer Mensah acted reasonably. (R. 76-23). |
| **February 2, 2020** | **Alvin Cole shooting** |
| **October 7, 2020** | The Milwaukee County District Attorney concluded that Officer Mensah's decision to use deadly force was privileged under Wisconsin's "self-defense or defense of others. (R. 76-25). |
| | **\*Officer Mensah did not return to Patrol after the Cole shooting, but WPD still conducted an internal review** |

After the Gonzalez shooting, the Milwaukee Police Department's Metropolitan Division responded to the scene and acted as the lead investigative agency. (R. 77-4 p. 1). Officer Mensah was thereafter referred to licensed professional counselor Marcia Williams at Systemic Perspectives, for evaluation and counseling. Officer Mensah met with Counselor Williams on July 27, 2015, August 3, 2015, August 18, 2015, and August 24, 2015. (R. 76 ¶ 8; R. 76-6; R. 77-2 pp. 234-235; R. 77-6 pp. 122-124)

After the Gonzalez shooting, the Milwaukee County District Attorney conducted an investigation and on October 1, 2016, issued their decision declining to bring criminal charges concluding that, "the actions of Officer Mensah and Officer Newman were privileged under the law of self-defense and defense of others, in that the officers reasonably believed that they were confronting an armed suspect who intended to cause them great bodily harm or death." (R. 76 ¶ 9; R. 76-7).

After the Gonzalez shooting, Officer Mensah remained on administrative leave until the conclusion of the Milwaukee Police Department investigation, the DA's charging decision, and his counseling sessions. (R. 71 ¶ 63).

Following the Gonzalez shooting and before returning to full duty, Officer Mensah and Officer Newman both underwent an after-action training with WPD Officer Bronner and WPD Lieutenant Zalewski. (R. 76-9).

After the Milwaukee County District Attorney rendered his decision to not charge Officer Mensah in the shooting of Antonio Gonzalez, WPD Lieutenant James Mastrocola conducted an internal administrative review of the actions of Officers Mensah and Newman from a policy and training perspective. (R. 71 ¶¶ 56-58; R. 77-4; R. 76-3 at 4)

That review determined that both Officer Mensah and Newman acted in accordance with their training and WPD policy.

The compliance with all City policies described above cannot be reasonably – indeed, Plaintiffs conceded them at summary judgment by offering no argument in response to the Defendants' summary judgment filings in the Gonzales case. (APP A 0002; *see also* R. 112) On this record, no reasonable factfinder could conclude that Wauwatosa or its Police Chief had a policy with constitutionally violative language nor that the City had adopted a "policy of inaction" with respect to training needs. See *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2014). With no evidence of an infirm policy, practice, or custom, and no evidence of deliberate indifference to constitutionally impermissible informal conduct or training, the district court decision to dismiss the *Monell* claims was proper.

On page 34 of their brief, Plaintiffs argue that the lower court made a mistake when it noted that Mensah was "internally investigated and evaluated by a specialist prior to his return to patrol" after the Gonzales shooting and prior to the Anderson shooting. (App. Br. at 34 citing R. 131 at 6) It is Plaintiffs who are mistaken – their citation is to the district courts' summary judgment order in the Alvin Cole case (R. 131) — not the Anderson case (R. 125). The courts complete finding was as follows:

> Plaintiffs allege that Weber failed to conduct an internal investigation of Mensah's fitness or to discipline him, for having previously shot and killed Antonio Gonzales and Jay Anderson, Jr. Weber, however, provided evidence that after each shooting, Mensah was placed on administrative leave, investigated internally and by an outside agency, received counseling from a licensed practitioner, and was evaluated by a specialist prior to his return to patrol. Plaintiffs do not provide evidence that Weber

> facilitated, approved, condoned, or turned a blind eye to unconstitutional
> conduct. Thus, Weber's motion for summary judgment will be granted.

(R. 131 at 6) The Wauwatosa Police Department did conduct internal investigations after

each of the Gonzalez and Anderson shooting incidents. *See generally* (R. 77-4, R. 77-9) And

Officer Mensah was evaluated by a specialist prior to his return to patrol after each of the

shooting incidents.

Plaintiffs are critical that no one from Wauwatosa spoke to Mensah after the

Gonzalez shooting before he returned to patrol.  Plaintiffs cite an email exchange for the

proposition that his supervisors would "keep an eye" on Mensah, and argue a detailed

interview was instead required. (App. Br. at 39 citing R. 91-12) WPD Police Lt. James

Mastrocola was tasked with conducting the internal review following the Gonzalez

shooting and explained that he did not think it was necessary re-interview Mensah

because he had already been interviewed by extremely skilled detectives from the

Milwaukee Police Department, as Wauwatosa policy required. (R. 77-3 at 119-121)

Chief Weber relied on opinions from professionals and the assessment of outside

law enforcement agencies in determining that Officer Mensah was able to perform his

law enforcement duties. (R. 80-8 pp. 94-98) Weber testified that no counselor raised any

concerns about Mensah's fitness to return to duty. (R. 80-8 pp. 90-96) Moreover, the

record demonstrates that after each shooting and in accordance with WPD policy, the

Police Department conducted its own an internal investigation. (R. 77-9, R. 77-4, R. 85-87)

**C.  The authority cited by Plaintiffs is neither applicable nor persuasive.**

Plaintiffs contend that an infirm "policy" of ignoring alleged mental health problems gives rise to liability in this case through the conduct of responsible policymakers. There is no legal or factual support for such an argument. Plaintiffs baselessly argue that Mensah's involvement in police shootings evidenced mental health problems that were ignored by his superiors. Plaintiffs' only purported support for that theory relies upon a series of deliberate indifference analyses in inmate Eighth Amendment medical need cases. (App Br. 37-39 citing *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917 (7th Cir. 2004) and *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017)). Neither case supports Plaintiffs' claim.

*Woodward* addressed a motion to overturn a jury verdict and centered on an analysis that concluded "ignoring a policy is the same as having no policy in place in the first place." *Woodward*, 368 F.3d at 920. The plaintiff in *Woodward* alleged that the defendant knowingly violated supervisory policies and thereby contributed to a suicide. The jury found that defendant's employees knew the plaintiff was suicidal, had attempted to kill himself in 1995, had ten prior psychiatric hospitalizations, a history of violent behavior, had depressing thoughts, and was overheard expressing thoughts of suicide. *Id.*, at 928. The Plaintiffs appear to be arguing that the egregious ignorance of policy in *Woodward* is akin to Wauwatosa failing to recognize danger in Mensah. But Plaintiffs offer absolutely no evidence that Mensah was, in fact, a danger.

As discussed above, Wauwatosa's conduct following the Gonzalez shooting complied in all respects with its post-incident policy requirements. There was no

interview, investigation of counselling report that found Mensah's conduct improper or that determined Mensah to be anything but fit to return to duty.

In *Glisson*, this court was presented with the question of whether the failure to coordinate medical care for an inmate whose significant medical needs were known and visible could amount a violation of the Eighth Amendment. In answering that question in the affirmative, the Court explained that "the key is whether there is a conscious decision not to take action." *Id*. 381. After each shooting in which he was involved, Mensah was required by Wauwatosa to participate in all of the procedures required by WPD and state statutes.

Relevant here, after the Gonzales shooting was "cleared" by multiple law enforcement agencies and a mental health professional, Mensah and the other WPD officer on scene returned to patrol. (R. 76 ¶¶ 6-11; R. 76-3; R. 76-5; R. 76-8; R. 77-3 pp. 38-39, 54-55, 87-90, 114-115; R. 77-2 pp. 234-235, 272-278; R. 77-4 pp. 1, 6, 8; R. 76-6; R. 76-7; R. 77-6 pp. 122-124) WPD Police Chief Weber confirmed that Mensah attended all required counseling and that no mental health professional raised any alarms or cautions about Mensah's mental health. Mensah was fully cleared by all professionals who interviewed him to return to patrol.

Inaction can give rise to liability in some instances if it reflects "a conscious decision not to take action." *Glisson*, 849 F.3d at 381. Plaintiffs must show that "the policy or custom demonstrates municipal fault," i.e., deliberate indifference. *LaPorta*, 988 F.3d at 986. "This is a high bar" and requires that Plaintiffs "must prove that it was obvious that

the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Id*. at 987.

Plaintiffs offer nothing but speculative argument and self-serving conclusions that simply because Mensah was involved in a prior shooting, Wauwatosa and Weber should have known he was mentally unfit. That is a nonsensical conclusion that Plaintiffs fail to support with any evidence whatsoever. As importantly, Plaintiffs have not produced any evidence that there accusation about Mensah's mental health ,caused a violation of Anderson's constitutional rights. The lead investigator in the Anderson shooting Detective O'Day, testified under oath that he was "100 percent convinced that Officer Mensah acted to defend his life." (R. 91-9 pp. 86) No reasonable jury viewing the admissible evidence in this case would find policies – formal or informal – of Police Chief Weber or the City of Wauwatosa culpable for Anderson's death.

## IV.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY GRANTING DEFENDANTS' MOTION FOR EXTENSION OF TIME TO ANSWER THE AMENDED COMPLAINT.

Federal Rule 6(b)(2) gives courts discretion in most situations to forgive missed deadlines by reason of "excusable neglect." District courts "enjoy wide latitude" in determining whether a litigant's explanation for missing a deadline amounts to excusable neglect. *Jones v. Bayler, No*. 22-1296, 2023 WL 3646069, at *2 (7th Cir. May 25, 2023), cert. denied, 144 S. Ct. 387 (2023); *Nartey v. Franciscan Health Hosp.*, 2 F.4th 1020, 1024 (7th Cir. 2021). As such, the Seventh Circuit reviews a district court's finding of excusable neglect under an abuse of discretion.

In *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, the Supreme Court held that the standard for review of excusable neglect:

> is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include ... the danger of prejudice to the [defendant], the length of the delay and its potential impact on judicial proceedings, the reasons for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Pioneer*, 507 U.S. 380, 385 (1993)(citations omitted). Excusable neglect is an "elastic concept" that permits courts to accept "late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Chorosevic v. MetLife Choices*, 600 F.3d 934, 946 (8th Cir. 2010).

The timeline in this case demonstrates that Defendants' failure to file a timely respond to Plaintiffs' amended complaint was excusable neglect. Defendants timely answered Plaintiffs' original and denied liability in all respects. (Anderson R. 14).

Plaintiffs filed an amended complaint on August 24, 2022. (Anderson R. 47) Defendants timely moved to dismiss that amended complaint for failure to state a claim. (Anderson R. 50) The district court granted Defendants' motion in part and dismissed the official capacity excessive force claims against the Wauwatosa Police Chief Weber as duplicative of the claims against the City (R. 54 at 4); dismissed the equal protection claims against Weber; dismissed the loss of society and companionship claim brought by Anderson's girlfriend (*id.* at 8); and further dismissed "Plaintiffs assortment of claims such as a purported deliberate inference claim under the Fourteenth Amendment, an indemnity claim, claims under § 1983 against CVMIC and claims involving damages." *Id.*

As a result, four operative claims in the Amended Complaint survived—excessive force under the fourth amendment, denial of equal protection under the fourteenth amendment, a *Monell* claim, and a loss of society and companionship claim brought by J.A. Other than the separately titled *Monell* claim, the claims that survived the motion to dismiss were duplicative of the claims and allegations asserted in the Plaintiffs' original complaint, all of which defendants timely denied. *Compare generally* (Anderson R. 1 and R. 47) Defendants specifically denied allegations relating to any purported unconstitutional "pattern or practice" by the city in their timely answer to the initial complaint. *Compare* (Anderson R. 1 ¶¶ 151-162 and R. 14 ¶¶ 151-162)

On July 24, 2023, Defendants moved for summary judgment seeking dismissal of the remaining claims and causes of action in their entirety. (R. 81) In response to Defendants' motion for summary judgment, Plaintiffs raised for the first time an argument that Defendants did not file an answer to the amended complaint. (R. 90 pp. 9-10) Upon receipt of that argument, Defendants immediately filed an expedited motion to expand the time within which to file their answer to the amended complaint along with a proposed answer. (R. 108) Defendants' expedited motion outlined their excusable neglect in failing to answer the amended complaint and requested that the district court act within its encompassing discretion under Rule 6(b)(2). (*id.*)

According to the Supreme Court and Seventh Circuit, the enumerated factors the district court considers when evaluating relief for excusable neglect include—the danger of prejudice to the non-movant, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable

control of the movant, and whether the movant acted in good faith. *Moje v. Fed. Hockey League, LLC*, 792 F.3d 756, 759 (7th Cir. 2015); see *Pioneer*, 507 U.S. at 385. Here, the district court considered these factors, took into account relevant circumstances, and found that Defendants' tardiness was excusable neglect:

> Defendants filed their motion for extension of time four months after the answers were due but only three days after they learned of the omission. The delay will not delay the case. Defendants acted in good faith as demonstrated by their attempt to rectify the omission as soon as it came to light. Most importantly, I find no prejudice to the nonmovant. Plaintiffs do not argue that they have suffered any prejudice. Nor is there any danger of prejudice. Plaintiffs knew that defendants disputed their factual allegations. The parties were engaged in discovery regarding such disputes at the time.

APP A 0005. Plaintiffs argue that the district court abused its discretion when it ruled that Defendants showed excusable neglect and allowed them to file a tardy answer.

Defendants filed their motion for extension four months after the amended answer deadline—but only three days after they learned of the omissions. But "[t]he point of the excusable-neglect standard is that neglect is assumed." *Mayle v. Illinois*, 956 F.3d 966, 968 (7th Cir. 2020). The civil docket in this case is vast, because the district court consolidated this case, the *Gonzalez* case, and the *Cole* cases.

Nevertheless, the record demonstrates that the Defendants' motion to dismiss the amended Anderson complaint was pending for approximately 8 months prior to a decision. *See* (R. 54) The filing deadline here fell during defense counsel's preparation for a five-day civil rights trial, and although draft answers had been prepared and saved within defense counsel's filing system, the press of business led to the inadvertent failure to finalize and file those Answers. (R. 108 at 2-3) Under those circumstances the district

court could reasonably concluded that Defendants' motion for relief—filed only three days after they became aware of the lack of formal answer to the amended complaint – and with no pending case management or litigation deadlines that would be interrupted or delayed, was excusably late.

Most importantly though, the Plaintiffs cannot claim that they were prejudiced by Defendants' oversight; "this [is] clearly a no harm, no foul situation." *Isby v. Clark*, 100 F.3d 502, 504 (7th Cir.1996) (finding no abuse of discretion in the district court's not imposing a default judgment against defendants who failed to file a new answer after the plaintiff amended his complaint). Plaintiffs offer no argument of prejudice beyond the self-serving claim that, despite the Defendants' denial of their claims in their original answer, Plaintiffs want the benefit of admissions that might be attributable to the claims not having been timely denied a second time. (App. Br. 32)

Plaintiffs also argue that the district court failed to follow Seventh Circuit precedent, citing *Modrowski v. Pigatto*, 712 F.3d 1166 (7th Cir. 2013) for the proposition that Defendants' failure to answer the Amended Complaint creates questions of fact precluding summary judgment. (App. Br. at 29) The reliance of *Modrowski* is confusing because the case offers no precedent on issues of excusable neglect or a request for relief under Fed. R. Civ. P. 6(b). Plaintiffs cite *Modrowski* for only the general principle that a failure to answer an amended complaint can constitute an admission. (App Br. at 30)

However, *Modrowski* involved a circumstance in which defense counsel "intentionally employed an unorthodox strategy" of answering an amended complaint with a motion for summary judgment and not filing a formal answer. *Modrowski*,712 F.3d

at 1170. Here, Defendants answered the Plaintiffs' original complaint (Anderson R. 14), moved to dismiss the Amended Complaint (Anderson R. 50), and filed for summary judgment after nearly two years of litigation (R. 78). There was nothing intentional about Defendants' failure to file a timely answer to Plaintiffs amended complaint—which is exactly why Defendants requested an extension arguing excusable neglect. (R. 108) The point of the excusable-neglect standard is that neglect is assumed, and the court then exercises its discretion in whether to excuse it. See *Pioneer*, 507 U.S. at 395.

Plaintiffs cite *Barwin v. Vill. of Oak Park*, No. 14-CV-6046, 2021 WL 6882305, at *1 (N.D. Ill. Apr. 30, 2021), aff'd in part, rev'd in part and remanded, 54 F.4th 443 (7th Cir. 2022)), as an example in which this Court affirmed the grant of summary judgment where the defendant failed to timely answer a complaint after eight months. (App Br. at 30). Unsurprisingly Plaintiffs omit the complete context, i.e.— the answer to the amended complaint was filed eight months after the Court's deadline, **with no explanation for the delay, causing considerable prejudice to Barwin**. *Id.* at *1 fn. 1. (emphasis added) Plaintiffs provide no context for the *Barwin* court's finding of "considerable prejudice," which stands in direct contrast to the district court's finding here.

Plaintiffs also cite *Central National Gottesman, Inc.*, *Cent. Nat'l Gottesman, Inc. v. J.S. Paluch Co.*, No. 19-CV-06997, 2021 WL 2939968, at *4 (N.D. Ill. July 12, 2021), as authority to decline relief from a missed answer deadline but, again, that case involved an intentional strategy to move for summary judgment instead of answering a complaint.

Plaintiffs' reliance on *L.A. Pub. Ins. Adjusters, Inc. v. Nelson,* 17 F.4th 521 (5th Cir. 2021) is similarly misplaced. See (App. Br. at 31) There, the plaintiff failed to file an

answer to a counterclaim within the time specified by FRCP 8(c)(2), a fact that the district court noted with a warning to plaintiff that the omission could result in an award of default judgment. (*Id*. at 523) Despite being warned by the district court, the plaintiff filed no answer to the counterclaim and made no request for an extension, choosing instead to move for partial summary judgment. (*Id*.) Defendant cross-moved for partial summary judgment on its counterclaim. While the cross-motions were pending—approximately 22 months after the counterclaim and six months after moving for partial summary judgment—the plaintiff finally moved for leave to answer the counterclaims. The district court granted plaintiff's motion for relief, finding excusable neglect. On appeal, the Fifth Circuit reversed, finding that the delay unfairly prejudiced the defendant:

> It was not until January 12, 2020—**nearly two years after the answer was originally due**, **nearly a year after LAPIA's failure to answer was recognized by the district court, six months after Nelson moved for partial summary judgment on the ground that no answer had been filed, and five-and-a-half months after LAPIA responded by arguing that no answer was needed**—that LAPIA finally conceded its mistake and sought to correct it.

*Id*. at 526-527 (emphasis added) Even if the Fifth Circuit decision was binding precedent—the circumstances in that case are clearly distinguishable from ours.

While *Burlington N. R. Co. v. Huddleston*, 94 F.3d 1413, 1415 (10th Cir. 1996) does stand for the position that a failure to file an answer constitutes an admission (App. Br. at 31), the case has no application to ours because it stands as an example of the risks of pursuing a strategy in which defendants choose not to answer a complaint at all. *Id*. at 1413 ("Defendant certainly would have been entitled to file an answer upon the district court's denial of the motion to dismiss, Fed.R.Civ.P. 12(a)(4)(A) but chose not to. Instead,

the parties' requested the court to decide the case as a matter of law on the record they presented.")

Plaintiffs cite *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) for the position that other circuits have found allegations in the original complaint deemed admitted for failure to timely answer. (App. Br. at 30) What *Finkle* actually held, though, was that when a party successfully moves for a default judgment, the moving party is "entitled to all reasonable inferences from the evidence offered." *Id.* Here, Plaintiffs did not move for default judgment, apparently employing an intentional strategy to combat summary judgment by arguing the lack of an answer created questions of fact. (App. Br. at 31-32) Instead, the Defendants immediately corrected their unintentional omission as permitted by the court.

"The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Edelman v. Belco Title & Escrow, LLC,* 754 F.3d 389, 394- 95 (2014). Plaintiffs' counsel asserted, in an August 23, 2023, email to defense counsel, that he was aware that an answer to the amended complaint was tardy, but ostensibly chose to continue the litigation up to and through the filing of the Defendants' motion for summary judgment. (R. 106-4)

Plaintiffs also argue that Defendants should have been aware of their failure to file an answer because Plaintiffs' Rule 30(b)(6) deposition notice directed to the City of Wauwatosa referenced the affirmative defenses in the original answer. (App Br. at 33) Plaintiffs' Notice made no demand that City representatives address any tardy answer to

the Amended Complaint. (R. 106-1 p. 4) It is impossible to view the Plaintiffs' response to summary judgment, which claimed that Plaintiffs were entitled to a finding of "factual disputes" attributable to the lack of a timely written answer to the amended complaint, as anything other than a pleading game of "gotcha" designed to try and force settlement discussions. That is exactly what *Edelman* cautions against. *Id*.

Even so, when considering the Defendants' Motion for Summary Judgment dismissal of all of Anderson's causes of action, the district court need not accept factually unsupported allegations, flatly contradicted by the record, and contrary to the purpose of summary judgment and equity. In opposing summary judgment, Anderson must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012). As noted throughout the courts' summary judgment order and decision on the motion to reconsider—the court relied on the evidence in this case and, particularly, the undisputed video record. (APP A 0004, 0009 and App B 0014)

Even if reasonable judges could differ on whether to excuse Defendants' neglect in timely answering the Amended Complaint, it was within the district court's discretion to excuse the neglect. Indeed, discretion allows two decision-makers – on virtually

identical facts – to arrive at opposite conclusions, both of which constitute appropriate exercises of discretion. District courts enjoy wide latitude in determining whether a litigant's explanation for missing a deadline amounts to "good cause" or "excusable neglect." Consequently, a decision one way or another in this area is seldom reversed by a reviewing court.  See, e.g., *Mayle*, 956 F.3d at 969 ("The district judge would not have abused his discretion if he had denied the extension, but he also did not abuse his discretion by granting it."). See also *Nestorovic*, 926 F.3d at 431–32 (an abuse of discretion only occurs "when the record contains no evidence on which [the district court] could have rationally based its decision or when the decision rests on an erroneous view of the law.") *Nartey v. Franciscan Health Hosp.*, 2 F.4th 1020 (7th Cir. 2021).

## CONCLUSION

For the reasons stated above, defendants request this court should affirm the district court.

Respectfully submitted this 7th day of February 2025.

<div style="margin-left:40%">

WIRTH + BAYNARD
Attorneys for Defendants-Appellees

By:   */s/ Jasmyne M. Baynard*
Jasmyne M. Baynard
WI State Bar No. 1099898
Joseph M. Wirth
WI State Bar No. 1012080
9898 West Bluemound Road
Wauwatosa, WI 53226
Telephone: (414) 291-7979
jmb@wbattys.com

</div>

# CERTIFICATE OF COMPLIANCE WITH
## FRAP RULE 32(a)(7), FRAP RULE 32(g) and CR 32(c)

The undersigned, counsel of record for the Defendants-Appellees, furnishes the following in compliance with F.R.A.P. Rule 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P Rule 32(a)(7), for a brief produced with a proportionally spaced font. The length of this brief is 13,867 words.

Respectfully submitted this 7th day of February 2025.

WIRTH + BAYNARD
Attorneys for Defendants-Appellees

By:     /s/ Jasmyne M. Baynard
Jasmyne M. Baynard
WI State Bar No. 1099898
9898 West Bluemound Road
Wauwatosa, WI 53226
Telephone: (414) 291-7979

**PROOF OF SERVICE**

The undersigned, counsel for the Defendants-Appellees, hereby certifies that on February 7, 2025, I electronically filed Defendants-Appellee's Brief with the Clerk of Court of the Court for the United States Court of Appeals for the Seventh Circuit Court and to counsel for Plaintiffs-Appellants, Kimberley Cy. Motley, Nathaniel Cade, Annalisa Pusick, and Madison Bedder, using the CM/ECF system.

Dated this 7th day of February 2025.

WIRTH + BAYNARD
Attorneys for Defendants-Appellees

By:   _/s/ Jasmyne M. Baynard_____
Jasmyne M. Baynard
WI State Bar No. 1099898
9898 West Bluemound Road
Wauwatosa, WI 53226
Telephone: (414) 291-7979